613 A.2d 402

**Todd William LAMB**

**v.**

**STATE of Maryland.**

**No. 353, Sept. Term, 1991.**

Court of Special Appeals of Maryland.

Oct. 1, 1992.

Nancy S. Forster, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Gwynn X. Kinsey, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Logan C. Widdowson, State's Atty. for Somerset County, Princess Anne, on the brief), for appellee.

Submitted before WILNER, C.J., and MOYLAN and ALPERT, JJ.

MOYLAN, Judge.

The appellant, Todd William Lamb, was convicted by a Somerset County jury, presided over by Judge Daniel M. Long, of 1) breaking and entering, 2) assault, 3) battery, 4) false imprisonment, and 5) reckless endangerment. He received a sentence of two years for breaking and entering and that judgment is of no further concern to us. The conviction for reckless endangerment was merged into that for assault and is also of no further concern to us.

The appellant received a consecutive sentence of ten years for assault, a consecutive sentence of six years for battery, and a consecutive sentence of six years for false imprisonment for a total of twenty-four years. He now argues:

1. That his conviction for assault should, as a lesser included offense, have merged into his conviction for battery; and

2. That his conviction for battery, in turn, should also, as a lesser included offense, have merged into his conviction for false imprisonment.

With the three convictions thus merged in the fashion the appellant would have them merged, his total sentence of twenty-four years would be reduced to a sentence of but eight years. Although the appellant made no timely objection to the nonmerger of convictions at the time of sentencing, it is clear that the issue of nonmerger is reviewable by an appellate court even absent preservation of the issue by the appellant. *Campbell v. State,* 65 Md.App. 498, 510–511, 501 A.2d 111 (1985).

### *The Relationships Among Assaults and Batteries*

We turn our attention initially to the arguable merger of assault into battery. It requires us to look at the crime (or crimes) of assault and the crime (or crimes) of battery generally and then to look at the particular assault in this case and the particular battery in this case specifically. Our general investigation will be doomed at the outset if we conceive of it as an exploration of *the* relationship between *assault* and *battery.* We must conceptualize it, rather, as an exploration of the multiple *relationships* among various *assaults* and various *batteries.* The key to avoiding the almost hopeless confusion clogging much of the case law is to think plural.

Ironically, it is sometimes these seemingly simplest of crimes that are the most difficult to master. The intricate overlapping of multi-layered continuing criminal enterprises and the nice distinctions between "spoke and wheel" conspiracies and "chain" conspiracies, for example, are as child's play to the familiar standby of assault and battery. This is not as remarkable as it at first may seem. The elements of latter-day statutory crimes, no matter how intricate, have been hammered out on the legislative anvil with meticulous precision. The common law standbys, by contrast, have grown by gradual and random accretion. As with a coral reef, there is no perceptible change from year

to year. Over centuries, however, there develop forms and shapes that bear but slight resemblance to the aboriginal prototype. Once reliable descriptions lose currency. Thus has it been with assault and battery.

### The Various Forms of Assault

Today, the term of art "assault" may connote any of three distinct ideas:

1. A consummated battery or the combination of a consummated battery and its antecedent assault;
2. An attempted battery;  and
3. A placing of a victim in reasonable apprehension of an imminent battery.

### A. A Battery Itself or a Combined "Assault and Battery":

By way of informal (or sometimes even formal) shorthand, both the case law and the statutory law frequently use the simple noun "assault" to connote a consummated battery alone and at other times to connote the combination of the inchoate attempt to beat or to batter followed immediately by the consummation of that attempt. Thus used, "assault" is a synonym for "battery" and is also a synonym for the combined form "assault and battery." It was of this we spoke in *Anderson v. State*, 61 Md.App. 436, 440, 487 A.2d 294, 295–296 (1985):

"One of the varieties of criminal conduct embraced by the word 'assault' or phrase 'assault and battery'[1] is a consummated battery.

[1] The single word 'assault' and the whole expression 'assault and battery' are frequently used as loosely synonymous terms. Just as 'assault' can mean an actual battery, as used above, it also embraces two other varieties of criminal conduct, not here pertinent: 1) an attempted battery, and 2) an intentional placing of another in apprehension of receiving an immediate battery."

The cognate noun "assailant," moreover, designating the assaulting criminal agent, embraces with equal certainty 1) one who attempts to beat, 2) one who only threatens to beat, 3) one who actually beats, and 4) one who both

attempts to beat and then beats. Conversely, we do *not* describe the criminal agent of a battery as a "batterer" or "beater" (except in such exotic forms as "wife-beater" or "child-beater"). The single term "assailant" does nicely for all of the assaultive modalities.

Legislatively, we have elevated to the felony level a series of aggravated assaults and/or batteries. Md.Ann.Code art. 27, § 12.[1] We call them, however, aggravated *assaults,* clearly using the word "assault" in its more embracing sense. Section 12 punishes at the felony level the crimes of "an assault with intent to rob," "an assault with intent to murder," and "an assault with intent to commit a rape in any degree or a sexual offense in the first or second degree." [2]

What Maryland has done legislatively is a common, if not universal, phenomenon among American states, just as is the subsumed use of the noun "assault" to connote a battery a common, if not universal, usage. W. LaFave and A. Scott, *Criminal Law* (2d ed.), § 7.15(d) at 688, explains:

"(d) **Aggravated Battery.** All jurisdictions have statutes, variously worded, which define *aggravated batteries* and punish them as felonies. Traditionally, the most

---

1. Except for denominating the aggravated attacks as felonies, the "get-tough" statute ironically placed a series of "caps" on the sentences for the aggravated assaults (and/or batteries) that had never theretofore been imposed, under common-law discretionary sentencing practice, for the simple common law misdemeanors before they were statutorily "enhanced." The State, of course, may still avoid the "caps" by relying exclusively upon the common law misdemeanors. *Simms v. State,* 288 Md. 712, 725–727, 421 A.2d 957 (1980); *Manigault v. State,* 61 Md.App. 271, 276–278, 486 A.2d 240 (1985); *Walker v. State,* 53 Md.App. 171, 193–200, 452 A.2d 1234 (1982); *Turner v. State,* 45 Md.App. 168, 172–173, 411 A.2d 1094 (1980). If the one-year statute of limitations has run on the misdemeanors, however, the State has no choice but to rely upon the "capped" statutory felonies. *Smallwood v. State,* 51 Md.App. 463, 467–468, 443 A.2d 1003 (1982).

2. Technically, § 12 has not created three new crimes. The statute has simply provided three ostensibly enhanced, felony-level sentencing provisions for three particularly aggravated forms of the same underlying and preexisting misdemeanor. *Manigault v. State,* 61 Md.App. 271, 284–285 n. 2, 486 A.2d 240 (1985).

common statute of this type was one covering *'assault*[33] with intent to murder' (or to kill, or to do great bodily injury, or to rape, rob, or commit mayhem).

[33] *The word 'assault' in this connection means both assault and battery."* (emphasis supplied).

■ Assaults with intent to rob, to be sure, will frequently involve "mere assaults" and not actual batteries, for the mere threatening of the battery is frequently the instrumentality of the intended robbery. *Rose v. State,* 37 Md. App. 388, 389–390, 377 A.2d 588 (1977). On the other hand, many intended robbery victims are actually wounded in the process or at least "yoked" to the ground by *"assaults* with intent to rob" consisting of actual batteries. *Bryant v. State,* 4 Md.App. 572, 575–579, 244 A.2d 446 (1968). Assaults with intent to murder may easily involve "mere assaults" (as where the bullet misses), *Woodard and Demby v. State,* 13 Md.App. 114, 123, 282 A.2d 9 (1971); *cf. Hall v. State,* 69 Md.App. 37, 46–47, 516 A.2d 204 (1986), or just as easily actual batteries (wherein the victim survives the attack). *Bremer v. State,* 18 Md.App. 291, 307 A.2d 503 (1973). In either event, they constitute *assaults* with intent to murder. Assaults with intent to rape (or to commit a sexual offense) will almost always consist of actual batteries, in the form of either violent force or offensive touching or both. *Duffin v. State,* 229 Md. 434, 184 A.2d 624 (1962). It is clear that the word "assault" in § 12 of art. 27 embraces not only attempted batteries but also actual batteries, as well as the combination of the two.

By way of interesting linguistic contrast, Md.Ann.Code art. 27, § 386 designates for punishment at the felony level anyone who "shall assault *or beat* any person, with intent to maim, disfigure or disable ..." (emphasis supplied). Two specific verbs are used instead of a single generic verb. It is clear, however, that the physical behavior explicitly embraced by § 386 is implicitly embraced by § 12, with the difference between the two statutory sets of aggravated attacks to be found only in their respective *mentes reae.*

Other instances abound of the legislative use of the word "assault" in its more comprehensive sense to embrace, *inter alia*, the notion of a battery. Former §§ 11B and 11C, repealed by ch. 655 of the Acts of 1969, provided special penalties for the crime of "Assault on Police." The primary legislative intent was clearly to cope with the problem of *batteries* upon police officers, although mere inchoate or attempted batteries were incidentally included as well. Indeed, former § 11B(a) expressly recognized both beating and striking as forms of assault, as it made it unlawful "for any person to beat, strike *or otherwise to assault* a policeman ..." (emphasis supplied).

Section 11E, mandating consecutive sentencing and prohibiting the suspension of a sentence in the case of an inmate being convicted of an "*assault* on another inmate or on an employee of the Division of Correction," (emphasis supplied) clearly embraces a battery upon an inmate as surely as it does an attempted battery. The subtitle as well as the statutory text uses the all-embracing term: "Assault by Inmates."

A nationwide reform movement in the late 1950's occurred in response to a growing recognition of the so-called "Battered Child Syndrome." Maryland's response to the problem was ch. 743 of the Laws of 1963, initially codified as art. 27, § 11A,[3] which created an aggravated assault at the felony level entitled "Assault on Child." *Anderson v. State*, 61 Md.App. 436, 442, 487 A.2d 294 (1985). Notwithstanding the use of the noun "assault," Maryland clearly was responding to the problem of battered children by prescribing heavy penalties for the battery of children. The critical prohibition was upon "caus[ing] abuse to the child," with "abuse" being defined as the "sustaining of physical injury by a child." The statutory offense of "*Assault* on

---

3. By ch. 500 of the Acts of 1970, it was relabeled as "Child Abuse" and transferred to a new § 35A. *See James v. State*, 5 Md.App. 647, 248 A.2d 910 (1969).

Child" punished more severely, by its very terms, the *battery* of a child.

Maryland's response to the growing national recognition of a problem more recently identified by the phrase "Battered Spouse Syndrome" was the passage of ch. 307 of the Laws of 1979, codified as § 11F and dealing with the problem of "Spousal assault." It would be disingenuous to suggest that the statute does not deal with the subject of spousal battery.

Chapter 263 of the Acts of 1965 is what Judge Orth in *Pope v. State,* 284 Md. 309, 325, 396 A.2d 1054 (1979), referred to as one of "two 'Good Samaritan' statutes which afford protection to one who assists another in certain circumstances." It created § 12A, subtitled "Assault—Third Person Aiding One Being Assaulted." It clearly contemplates, *inter alia,* a battery in progress as it provides that any "person *witnessing a violent assault* upon the person of another may lawfully aid *the person being assaulted* by assisting in that person's defense." (emphasis supplied). *See Alexander v. State,* 52 Md.App. 171, 447 A.2d 880, *aff'd,* 294 Md. 600, 451 A.2d 664 (1982).

Although mildly deprecating such more comprehensive usage, W. LaFave and A. Scott, *Criminal Law* (2d ed. 1986), § 7.14(a) at 684, nonetheless recognizes the broader usage:

> "[T]he word 'assault' is sometimes used loosely to include a battery, and the whole expression 'assault and battery' to mean battery, ..."

The Model Penal Code (1985) points out, at 125, in its Explanatory Note for § 211 dealing with "Assault," that § 211.1 "effects a consolidation of the common law crimes of mayhem, battery, and assault." In defining "Simple Assault," § 211.1 provides:

> *"A person is guilty of assault if he:*
>
> (a) attempts to cause or purposely, knowingly or recklessly *causes bodily injury to another;* or

(b) negligently causes bodily injury to another with a deadly weapon; or

(c) attempts by physical menace to put another in fear of imminent serious bodily injury." (emphasis supplied). *And see* R. Perkins, *Criminal Law* (3d ed. 1982), ch. 2, § 2 "Assault and Battery," at 172 ("Some of the new penal codes include the whole field of assault and battery under the name of 'assault' "). *See also* Hall, "Assault and Battery by the Reckless Motorist," 31 Jrnl.Amer.Inst. of Crim.L. 133, 136–137 (1941): "If there has been actual physical injury or an offensive touching, courts often use the terms 'assault' and 'battery' interchangeably to apply to the crime." *See,* however, *Woods v. State,* 14 Md.App. 627, 632, 288 A.2d 215 (1972).

Although a more meticulous maintaining of a distinction between an assault and a battery is probably to be preferred, the word does bear, *inter alia,* this all-inclusive meaning and there will be no fatal variance between an allegation of assault and a proof of battery. As was stated by Perkins, "Non–Homicide Offenses Against The Person," 26 Boston Univ.L.Rev. 119, 132 (1946): "[I]f the attempt to commit a battery is successful the actual conviction may be either (1) battery, (2) assault and battery, or merely (3) assault."

When the word "assault" is used in this comprehensive way exclusively to connote or inclusively to embrace a battery, one cannot, of course, speak of *a relationship between* assault and battery. The present problem before us, however, deals with a relationship. This broad meaning of the word "assault," therefore, will be used no further in this opinion and all subsequent discussion will deal only with those narrower and more precise connotations of "assault" that are distinct from any suggestion of a consummated battery.

### B. An Attempted Battery:

One of the two more precise meanings of the term "assault" is that of an attempted battery. This was the

only meaning of "assault" at the early criminal law. R. Perkins, *Criminal Law* (3d ed. 1982) at 159, points out the limited contours of the crime in its earliest manifestation:

"In the early law the word 'assault' represented an entirely different concept in criminal law than it did in the law of torts. *As an offense it was an attempt to commit a battery....*

Some commentators have been so imbued with the tort theory of assault that they have had difficulty in realizing that *in the early law a criminal assault was an attempt to commit a battery and that only."* (emphasis supplied).

Although the concept of criminal assault has now taken on an additional (and quite distinct) meaning, it still embraces all that conduct that would fit within the definition of an attempted battery. Even though it enjoys a special name or label of its own, it still shares the characteristics of all other attempts. As an attempt, it is, of course, a specific intent crime. The specific object or purpose intended is the commission of a battery, the inflicting of physical injury upon the victim or some other offensive touching of the victim. As with all attempts, the assault of the attempted-battery variety is established regardless of whether the effort succeeds or fails to achieve its purpose. As W. LaFave and A. Scott, *Criminal Law* (2d ed. 1986), at 692, points out:

"(a) **Assault as Attempted Battery.** An attempt to commit any crime requires a specific intent to commit that crime; and so assault of the attempted-battery sort requires an intent to commit a battery, *i.e.,* an intent to cause physical injury to the victim. Thus in those jurisdictions where an assault is limited to an attempted battery, an intent merely to frighten, though accompanied by some fear-producing act like pointing an unloaded gun at the victim, will not suffice. And since an intent to injure is required for an attempted battery, recklessness or negligence which comes close to causing injury—as

where *A,* driving his car recklessly, just misses striking *B*—will not do for an assault." (footnotes omitted).

■ Some of the Maryland case law has defined the crime of assault exclusively as an attempted battery, apparently oblivious to any other possible meaning of the term or, at least, guilty of an under-inclusive and unduly narrow statement of the offense. In *Weddle v. State,* 4 Md.App. 85, 90, 241 A.2d 414 (1968), we employed the partial definition:

> "The crime of assault is an attempt by force to injure the person of another."

In *Ott v. State,* 11 Md.App. 259, 265, 273 A.2d 630 (1971), we pointed out that "[a]ssault has been defined as any attempt to apply the least force to the person of another." In *Yantz v. Warden,* 210 Md. 343, 351, 123 A.2d 601 (1956), the Court of Appeals used the limited definition, without any suggestion of any additional content to the term: "The crime of assault is an attempt by force to injure the person of another." An attempt to apply force indirectly (as by burning a house) may also constitute an assault. *Taylor v. State,* 52 Md.App. 500, 450 A.2d 1312 (1982).

That original, criminal-law meaning of "assault" as an attempted battery has, to be sure, retained its full vitality. What it has lost is its exclusivity. For those who have not kept pace with the loss of exclusivity, the resultant narrow conceptualization of assault simply as an attempted battery, and nothing more, has given rise to such slippery and treacherous half-truths (to be more fully discussed hereinafter) as:

1) Assault is an inchoate crime;

2) Assault requires a specific intent to commit a battery;

3) Every battery includes an assault;

4) There can be no such crime as an attempted assault.

None of these familiar and oft-quoted "principles" is totally true. None of them, however, is totally false. They are all half-truths; and therein lurks their insidious capacity to lead the unwary astray.

### C. A Threatening of an Imminent Battery:

The more recent accretion to the coral reef of criminal assault is the replication in that new environment of the familiar tort of assault. W. LaFave and A. Scott *Criminal Law* (2d ed. 1986), noted this engrafting process, at 693, under the subhead of "Assault as Intentional Scaring":

"[M]any jurisdictions have extended the scope of the crime of assault to include, *in addition to* (not as an alternative to) the attempted-battery type of assault, the tort concept of the civil assault, which is committed when one, with intent to cause a reasonable apprehension of immediate bodily harm (though not to inflict such harm), does some act which causes such apprehension." (footnote omitted) (emphasis in original).

Under the subheads of "2. The Changing Concept," and "A. Criminal Assault Based Upon a Tort Theory," R. Perkins, *Criminal Law* (3d ed. 1982), explained, at 161–162:

"While few jurisdictions have abandoned the original basis for establishing a criminal assault in the absence of statute, there has been a tendency in many to add the tort theory as an additional ground. Where the tort theory has been added, a simple criminal assault 'is made out from *either an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery.*' This position, it may be added, has now been taken by a majority of the jurisdictions." (footnotes omitted) (emphasis supplied).

Professor Perkins went on to note, at 162, that this metamorphosis of an old tort into a new aspect of an old crime was a purely semantic accident:

"[T]he change did not come about as a result of a conscious effort to enlarge the scope of a criminal offense, but as a consequence of the confusion caused by the use of the same word to represent two different concepts." (footnote omitted).

The merger of the two concepts of assault has been in process for at least two hundred years. It has been a process, moreover, more inadvertent than advertent. One commentator has observed in "Is A Criminal Assault A Separate Substantive Crime Or Is It An Attempted Battery?," 33 Ky.L.J. 189 (1944–1945):

"An examination of the criminal assault cases which have been decided during the last two hundred years discloses the fact that the courts have used two fundamentally different theories in defining the offense. Different results have been reached in describing and punishing the same offense, depending largely upon whether the courts have looked upon the offense as a separate substantive crime or whether they have looked upon it as an attempted battery. *There is little indication that the courts have carefully thought it out one way or the other."* (footnotes omitted) (emphasis supplied).

This latter-day addition to the crime of assault not only came out of the tort of assault but it mirrors the tort precisely in terms of its character and its necessary elements. W. Prosser and P. Keeton, *The Law of Torts* (5th ed. 1984), at 43, describes the tort (and, thereby, one form of the crime):

"The interest in freedom from apprehension of a harmful or offensive contact with the person, as distinguished from the contact itself, is protected by an action for the tort known as assault. No actual contact is necessary to it, and the plaintiff is protected against a purely mental disturbance of this distinctive kind. This action, which developed very early as a form of trespass, is the first recognition of a mental, as distinct from a physical, injury. There is 'a touching of the mind, if not of the body.' " (footnotes omitted).

For this variety of assault, it is not necessary that the victim be actually frightened or placed in fear of an imminent battery at the hands of one with the apparent present ability to commit such a battery. The critical state of mind on the part of the victim is to be placed "in reasonable

apprehension" of an impending battery. This distinction preserves the rights of the intrepid crime victim or intrepid plaintiff. As W. LaFave and A. Scott, *Criminal Law* (2d ed. 1986) explained, at 693 n. 18:

> "The word 'scare' or 'frighten' is sometimes used loosely herein as a short term for the more cumbersome but more accurate expression 'causing reasonable apprehension of immediate bodily harm.' *See* W. Prosser & W. Keeton, *Torts* § 10 (5th ed. 1984), speaking of the requirement of apprehension of immediate bodily harm required for a civil assault: 'Apprehension is not the same thing as fear, and the plaintiff is not deprived of his action merely because he is too courageous to be frightened or intimidated.' "

*See also Dixon v. State,* 302 Md. 447, 461–462, 488 A.2d 962 (1985); and *Hayes v. State,* 211 Md. 111, 116, 126 A.2d 576 (1956) ("Nor need it be shown that the person assailed was actually put in fear, if the means employed are calculated to instill fear in the heart or mind of a reasonable man"). *And see Second Restatement of Torts,* § 24, Comment b.

Maryland, early on, included this tort concept of assault as part of its common law crime of assault. *Handy v. Johnson,* 5 Md. 450, 465 (1854) held:

> "Where an assault is charged the authorities show that the jury are to decide whether there was any intention to do any violence or injury; *but the authorities also establish,* that if in a threatening and rude or angry manner a man points a sword, or fork, at another, or shakes his fist in the face of the other, within striking distance, attended with a present ability to strike, although no stroke is given, such act is an assault, notwithstanding the failure to strike." (emphasis supplied).

Notwithstanding *Handy v. Johnson,* the subsequent case of *Yantz v. Warden,* 210 Md. 343, 351, 123 A.2d 601 (1956), lapsed into an earlier narrowness of vision with its under-inclusive but ostensibly definitive statement that the "crime of assault is an attempt by force to injure the person of another." In *Kellum v. State,* 223 Md. 80, 84–85, 162 A.2d

473 (1960), Chief Judge Brune gently took *Yantz v. Warden* off the hook for its apparently unwitting incompleteness:

"The statement in *Yantz v. Warden*, 210 Md. 343, 351, 123 A.2d 601, that '[t]he crime of assault is an attempt by force to injure the person of another' is not inconsistent with the general statement made in Clark & Marshall just quoted. *It was a sufficient definition for the purposes of that case, though not perhaps a full and comprehensive definition of the term*, which has substantially (if not exactly) the same meaning in our law of torts as in our criminal law. We are not aware of any possible difference which might affect the result here. *See also* IV Blackstone, *Commentaries* (Oxford, 1769), pp. 216–217, as to the likeness of assault and battery as private and public wrongs." (citations omitted) (emphasis supplied).

*See also Veney v. State*, 251 Md. 159, 176, 246 A.2d 608 (1968).

Judge Brune's efforts, however, could not prevent subsequent backsliding, clearly attributable to the stubborn reluctance, if not incapacity, of the case law to conceptualize in the plural. The inclusion, under the umbrella term "assault," of the original crime of attempted battery and the tort of intentional threatening frequently produced not a recognition of two separate forms of prohibited behavior, as it should have, but rather a piling of additional elements onto a single definition that soon grew into an unmanageable monstrosity. *Williams v. State*, 4 Md.App. 643, 647, 244 A.2d 619 (1968), defined assault as an attempted battery and then bizarrely treated the alternative form of assault simply as an instance of attempted battery:

"The crime of common law assault is 'an attempt by force to injure the person of another ... The attempt is made whenever there is any action or conduct reasonably tending to create the apprehension in another, that the person engaged therein is about to apply such force to him. It is sufficient that there is an apparent intention to inflict a battery and an apparent ability to carry out such inten-

tion.... It is not necessary that there should be a specific purpose to do a particular injury.' "

*Ott v. State,* 11 Md.App. 259, 265, 273 A.2d 630 (1971), reiterated this solemnly impressive but misleading and poorly articulated notion:

"Assault has been defined as any attempt to apply the least force to the person of another. The attempt is made when there is any action or conduct reasonably tending to create apprehension in another and that the person engaged therein is about to apply such force to him."

*See also Lyles v. State,* 10 Md.App. 265, 267, 269 A.2d 178 (1970). *And see* R. Gilbert and C. Moylan, *Maryland Criminal Law: Practice and Procedure* (1983), at 47–49. Once an authoritative opinion utters an unintelligible definition, of course, others, like lemmings marching toward the sea, repeat it slavishly. The slap-dash and garbled rendition becomes, with familiarity, a revered ceremonial chant.

The ultimate cacophony was *Woods v. State,* 14 Md.App. 627, 629–633, 288 A.2d 215 (1972), an eclectic collection of partial statements and single-sentence cliches culled exhaustively from the Maryland case law and from legal digests and encyclopedias. Mutually contradictory and divergent statements were all taken alike as equal gospel and there was no effort to reconcile them or to integrate them into a coherent body of legal doctrine. In fairness, the earlier definitional failures of this Court largely trace back to unquestioning but questionable reliance upon the erstwhile Olympian authority of L. Hochheimer, *Crimes and Criminal Procedure* 287–288 § 254 "Assault" (2d ed. 1904).

In *Dixon v. State,* 302 Md. 447, 488 A.2d 962 (1985), the Court of Appeals clearly recognized the plural nature of the crime of assault. Judge Menchine observed, "Assault is a common law offense that has been the subject of many definitions." *Dixon,* 302 Md. at 456, 488 A.2d 962. He quoted with approval R. Perkins, *Perkins on Criminal Law* 114 (2d ed. 1969), which defined assault in the plural:

"[A]ssault is (1) an attempt to commit a battery *or* (2) an intentional placing of another in apprehension of receiving an immediate battery." (emphasis supplied).

The most articulate exposition we have had on common law assault and its rich variety was that provided by Judge Alpert in *Harrod v. State,* 65 Md.App. 128, 499 A.2d 959 (1985). At the outset of the opinion, he pointed out that assault is not one crime but two:

"The common law crime of assault encompasses two definitions: (1) an attempt to commit a battery or (2) an unlawful intentional act which places another in reasonable apprehension of receiving an immediate battery. The facts in the instant case present this court with an excellent opportunity to explain the distinctions between these two different types of assault." (citations omitted).

*Harrod,* 65 Md.App. at 131, 499 A.2d 959. He observed again:

"[A]n assault 'is committed when there is *either* an attempt to commit a battery *or* when, by an unlawful act, a person is placed in reasonable apprehension of receiving an immediate battery.' These two types of assaults— *attempted battery and putting another in fear—are indeed two distinct crimes that have been inadvertently overlapped and confused.*" (citation omitted) (emphasis supplied).

*Harrod,* 65 Md.App. at 133, 499 A.2d 959. *See also Hall v. State,* 69 Md.App. 37, 44–45, 516 A.2d 204 (1986); *Snowden v. State,* 321 Md. 612, 617, 583 A.2d 1056 (1991).

Common law assault, then, is a chameleon concept that no one should attempt to describe too precisely. It takes on different colorations in different factual settings. The Maryland State Bar Association's *Maryland Criminal Pattern Jury Instructions* has handled the plural nature of common law assault by providing not one recommended instruction, but three. MPJI–CR 4:01.1 defines for the jury the necessary elements of assault of the "intent to frighten" variety. MPJI–CR 4:01.2 provides a different instruc-

tion, listing different elements, for assault of the "attempted battery" variety. MPJI–CR 4:01 provides an omnibus instruction for the situation where the evidence of assault supports either variety of the crime. It begins by informing the jury of the plural nature of the crime:

"The defendant is charged with the crime of assault. There are two types of assault. The first type is committed by intentionally making another person fear immediate [offensive physical contact] [physical harm]. The second type is committed by actually attempting to cause [offensive physical contact] [physical harm]."

It then takes up each of the two varieties in turn, providing a separate list of required elements for each. It does not attempt to lump the two together under any sort of composite definition.

### D. A Comparison of Attempted Battery and Intentional Frightening:

Leaving aside for the moment any connotation of "assault" as either 1) a consummated battery or 2) a combination of assault and battery, the remaining two connotations alone illustrate how dangerous it is to make any generalized statement about the "crime of assault." A perfectly correct, albeit incomplete, statement will frequently be made about one species of assault. The unwary auditor or reader, however, will unwittingly assume that the given description of one species of assault applies with equal validity to the entire genus "assault." That description may then, in turn, be erroneously misapplied to a different species of assault as to which is totally inappropriate.

◼ Assault of the attempted battery variety, for instance, is an inchoate crime. It shares with all other attempts the general characteristics of that variety of inchoate crime. Assault of the intentional threatening variety, on the other hand, is not in any sense inchoate. It is a fully consummated crime once the victim is placed in reasonable apprehension of an imminent battery.

■ It is generally agreed that an assault of either variety requires only an *apparent* present ability rather than an *actual* present ability to consummate the battery. *See Hayes v. State*, 211 Md. 111, 115, 126 A.2d 576 (1956). The apparency, however, is assessed from opposite perspectives. For an assault of the attempted battery variety, there must be an apparent present ability from the viewpoint of the would-be assailant. Unless he thinks he can execute the battery, he will lack the required specific intent to do so.

■ For an assault of the intentional frightening variety, on the other hand, the assailant may be guilty even though he knows full well that he lacks any ability to follow through on his threat. That he knows the gun he points is unloaded or defective or is no gun at all is of no consequence. *Dixon v. State*, 302 Md. 447, 463–464, 488 A.2d 962 (1985). From his perspective, there is no apparent present ability but that will avail him naught. *Hayes v. State*, 211 Md. 111, 115, 126 A.2d 576 (1956). All that is required in terms of perception is an apparent present ability from the viewpoint of the threatened victim. *Hall v. State*, 69 Md. App. 37, 45, 516 A.2d 204 (1986). If, on the other hand, the would-be victim of the threat is unaware of the threatening conduct, there can be no assault of this variety. *Harrod v. State*, 65 Md.App. 128, 138, 499 A.2d 959 (1985). If the would-be victim perceives the threatening conduct but knows, for instance, that the gun is defective, there is no apprehension of an imminent battery and, therefore, no assault of the threatening variety.

In terms of whose perception matters, that aspect of assault which came originally from the criminal law, concerned as it is with blameworthiness, is primarily defendant-oriented. That aspect of criminal assault which appeared initially in tort law, concerned as it is with harm, is primarily victim-oriented.

■ Both varieties of assault are specific intent crimes. The specific intents, however, are not identical. An assault

of the attempted battery variety requires a specific intent to perpetrate a battery.[4] *Harrod v. State*, 65 Md.App. 128,

---

**4.** The battery thus intended and thus attempted may, of course, consist of actual physical harm and traumatic injury or it may just as surely consist simply of offensive touching.

Either through defining "harm" or "injury" so broadly as to include offensive touching or through ignoring this second aspect of battery, the case law has generated some potentially confusing language with respect to the intent element of assault. *Yantz v. Warden*, 210 Md. 343, 351, 123 A.2d 601 (1956), for instance, defines assault as "an attempt by force *to injure* the person of another." (emphasis supplied). Upon the authority of *Yantz, Cousins v. State*, 277 Md. 383, 397, 354 A.2d 825 (1976), states, "Assault requires proof of *an intent to injure* another by force." (emphasis supplied). *Eccles v. State*, 59 Md.App. 554, 560, 476 A.2d 1183 (1984), relied upon that inadvertently partial statement of the intent element as an exclusive statement in reaching a questionable result on the facts before it.

The Maryland Criminal Pattern Jury Instructions, on the other hand, have been meticulously careful to avoid the pitfalls of this half-truth and/or potentially confusing language with respect to what is intended by one who attempts a battery. MPJI–Cr 4:01 and MPJI–Cr 4:01.2 carefully define the intent element of an assault of the attempted battery variety in the alternative:

"that the defendant intended to bring about [offensive physical contact] [physical harm];"

If the crime of battery includes offensive touching or contact, which indisputably it does, then an attempted battery, to wit, an assault, requires simply an intent to do the thing which constitutes a battery. W. LaFave and A. Scott 685 *Criminal Law* (2d ed. 1986), addresses the definitional problem:

"The required result for battery might be termed 'bodily injury' so as to include such obvious matters as wounds caused by bullets or knives, and broken limbs or bruises inflicted by sticks, stones, feet or fists.... But, in addition to these more obvious bodily injuries, offensive touchings ... will also suffice for battery." (footnotes omitted).

R. Perkins *Criminal Law* 182 (3d ed. 1982), discusses what "the unlawful application of force" contemplates in the context of defining a battery:

"It is sometimes spoken of as 'the unlawful beating of another,' or the 'use of physical violence by one person toward another.' Such expressions tend to be misleading. As a matter of law the slightest touching of another is a battery if it is unlawful. As it has been said, 'violence' and 'force' are synonyms when used in this connection and include any application of force even though it entails no pain or bodily harm and leaves no mark. As explained by one court a battery is 'the actual infliction of corporal hurt on another (e.g., the least touching of another's person) willfully or in anger.'

135, 499 A.2d 959 (1985). No design or purpose to threaten or to frighten the victim is in any way necessarily implicated, although it certainly is not precluded. An attempted battery can be perpetrated on a victim who is asleep, is facing in another direction or is otherwise oblivious of any danger. A truly deadly assailant may, indeed, prefer not to tip his hand with any antecedent threat.

■ An assault of the intentional frightening variety, on the other hand, requires a specific intent to place the victim in reasonable apprehension of an imminent battery. That the assailant definitely does *not* intend to carry through on the threat is of no consequence. If, however, the threatening assailant does intend to carry through on the threat and attempts to do so, then both varieties of assault have converged in a single criminal attack. The two forms of assault need not necessarily be in the alternative. They may combine and they frequently do.

In terms of specific intent, the attempted battery variety of assault requires that the assailant intend to punch, whether he intends to signal the punch or not. The threatening variety of assault, on the other hand, requires that the assailant intend to signal the punch, whether he intends to punch or not.

### The Various Forms of Battery

Today, the term of art "battery" may connote either of two forms of offensive touching or other application of force:

1. An intended battery; or

---

The 'corporal hurt' in this case was the putting of a hand lightly on the shoulder." (footnotes omitted).

*Eccles v. State,* at 59 Md.App. 560, 476 A.2d 1183, apparently tripped over this linguistic snare. In defining assault, it took "the intent to injure" notion out of context and came to the questionable conclusion that an intent to make a nonconsensual sexual contact with a victim would not satisfy the intent element of assault of the attempted-battery variety. If the sexual contact would be a battery, then the attempt (including the intent) to make that sexual contact would be, by definition, an assault. The assault would require no further intent.

2. An unintended battery.

## A. *An Intended Battery:*

■ The definition of the physical component of the common law misdemeanor of battery is hornbook law. It is any unlawful application of force, direct or indirect, to the body of the victim. W. LaFave and A. Scott, *Criminal Law* 685 (2d ed. 1986), defines it in the following terms:

"[B]attery is a crime which is defined, like murder and manslaughter, in terms not only of conduct but also of a specified result of conduct. The required result for battery might be termed 'bodily injury' so as to include such obvious matters as wounds caused by bullets or knives, and broken limbs or bruises inflicted by sticks, stones, feet or fists. A temporarily painful blow will suffice, though afterward there is no wound or bruise or even pain to show for it. But, in addition to these more obvious bodily injuries, offensive touchings (as where a man puts his hands upon a girl's body or kisses a woman against her will, or where one person spits into another's face) will also suffice for battery under the traditional view." (footnotes omitted).

R. Perkins, *Criminal Law* 152–153 (3d ed. 1982), provides the following description of the force component:

"It is sometimes spoken of as 'the unlawful beating of another,' or the 'use of physical violence by one person toward another.' Such expressions tend to be misleading. As a matter of law the slightest touching of another is a battery if it is unlawful. As it has been said, 'violence' and 'force' are synonyms when used in this connection and include any application of force even though it entails no pain or bodily harm and leaves no mark. As explained by one court a battery is 'the actual infliction of corporal hurt on another (e.g., the least touching of another's person) willfully or in anger.' The 'corporal hurt' in this case was the putting of a hand lightly on the shoulder. It was the touching of a woman by a man under circumstances causing great resentment as he had every reason

to expect. Wilfully spitting on another is a battery."
(footnotes omitted).

The Court of Appeals defined battery in *Snowden v. State*, 321 Md. 612, 617, 583 A.2d 1056 (1991), simply as:

"Battery, another common law offense, is the unlawful application of force to the person of another."

The Court of Appeals in *State v. Duckett*, 306 Md. 503, 510, 510 A.2d 253 (1986), observed, "Battery ... has been traditionally defined by our court as the unlawful beating of another." *See also Kellum v. State*, 223 Md. 80, 162 A.2d 473 (1960); *Lamb v. State*, 67 Md. 524, 534, 10 A. 208 (1887).

Simply by way of stressing that battery includes offensive touching as well as more violent force, this Court defined battery in *Leatherberry v. State*, 4 Md.App. 300, 305, 242 A.2d 599 (1968), *quoting* Clark and Marshall, *Crimes* § 10.19 (6th ed. 1958), as:

"Any unlawful injury whatsoever, however slight, actually done to the person of another, directly or indirectly, in an angry, revengeful, rude, or insolent manner, is a battery."

*See also Price v. State*, 5 Md.App. 127, 130, 245 A.2d 600 (1968). In *Kellum v. State*, 223 Md. 80, 85, 162 A.2d 473 (1960), the Court had observed in this regard that "any unlawful force used against the person of another, no matter how slight, will constitute a battery." The Court of Appeals in *State v. Duckett*, 306 Md. at 510–511, 510 A.2d 253, stressed the incredible variety of the forms that offensive touching may take:

"Like indecent exposure, then, the types of offenses which fall within the ambit of the crime of battery vary widely. A person may commit battery by kissing another without consent, touching or tapping another, jostling another out of the way, throwing water upon another, rudely seizing a person's clothes, cutting off a person's hair, throwing food at another, or participating in an

unlawful fight. On the other hand, a battery may take the form of a severe beating." (citations omitted).

The application of force may be indirect as well as direct. W. LaFave and A. Scott, *Criminal Law* 685–686 (2d ed. 1986), explained:

"The force used need not be applied directly to the body of the victim, as in the usual case where one shoots at another or strikes him with knife, club or fist. It may also be indirectly applied to the victim, as where one whips the horse on which the victim is riding, causing the horse to bolt and throw his rider, or where one compels another to touch him in a way offensive to the other. So too a battery may be committed by administering a poison or by infecting with a disease." (footnotes omitted).

With slightly different examples, the same thought was expressed by R. Perkins, *Criminal Law* 153–154 (3d ed. 1982):

"Force may be applied to the person of another in many ways, as by striking another with the fist or a stick or a stone, by kicking or tripping, lassoing with a rope, cutting with a knife, or shooting. As has been said, a battery is an application of force to the person of another 'by the aggressor himself, or by some substance which he puts in motion.' It may be committed by administering a poison or other deleterious substance, by applying a caustic chemical, or by communicating a disease. It may be perpetrated in even more indirect forms, as by exposing a helpless person to the inclemency of the weather, or by threatening sudden violence and thereby causing another to jump from a window or a moving vehicle or other place. A battery may be committed by directing a dog to attack a victim." (footnotes omitted).

The excellent analysis by Judge Wilner in *Taylor v. State*, 52 Md.App. 500, 450 A.2d 1312 (1982), involved such an indirect application of force. An assault (with intent to murder) was perpetrated on two victims by the intentional setting afire of the dwelling-house they occupied with the intent to injure them thereby.

W. LaFave and A. Scott, *Criminal Law* 686 (2d ed. 1986), also points out that a battery may be perpetrated by an act of omission as well as by an act of commission and that transferred intent is as viable a notion in the law of battery as it is in the law of homicide:

"As with other cause-and-result crimes, battery may be committed, if the other elements of the crime are present, by creating a situation under which the victim injures himself, as by telling a blind man walking toward a precipice that all is clear ahead, thus intentionally or recklessly causing him to fall and hurt himself, or even by a simple omission to act where there is a duty to act, as where a hospital attendant fails to warn his blind patient that he is headed for an open window, thereby intentionally or recklessly causing him to fall to the ground. And, as is true of all cause-and-result crimes, one may be guilty of battery though his aim at *A* is bad and he hits *B*, the wrong person." (footnotes omitted).

The overwhelming majority of the criminal batteries that are committed are intended and this has led to the mistaken belief that all criminal batteries are intended. An intended battery is, by definition, a specific intent crime.[5] It em-

---

5. Casual references throughout the case law sometimes refer to even an intended battery as a general intent crime, but other references, equally casually, refer to it as a specific intent crime. The difficulty is a classic semantic one. It is probably the case that a simple binary choice between "general intent" and "specific intent" is inadequate to categorize the myriad intents with which legal analysis must deal. The band between an indisputably general intent and an indisputably specific intent is an unbroken continuum with no point of dramatic demarcation.

An intent to fire a gun is general and is obviously less specific than the further intent to hit the victim with the bullet. When one is focusing on the difference between these two intents, therefore, it is natural to refer to the first as general and to the second as specific. When, on the other hand, one is focusing on the difference between a simple battery and an aggravated assault, the attention is on the difference between hitting the victim, on the one hand, and accomplishing some more remote purpose thereby such as maiming, killing, raping, or robbing, on the other hand. In the course of that very different comparison, there is an equally natural tendency to refer

braces its inchoate antecedent of assault, attempted-battery variety, which involves, of course, precisely the same specific intent to perpetrate the battery. The combination of the attempt and its successful consummation is classic "assault and battery." Almost all statements made about the relationship between an assault and a battery take for granted that the battery was intended.

### B. An Unintended Battery:

■ The field of criminal battery, however, is actually more complicated than many realize because of the less well-known inclusion in that field of unintended batteries. When the physical application of force is inflicted on the body of the victim, the specific intent to harm the victim is not the only *mens rea* that may give rise to the crime of battery. There are two separate forms of unintended battery.

The first is where the physical harm is the result of criminal negligence—not ordinary negligence but *criminal* negligence. W. LaFave and A. Scott, *Criminal Law* 687 (2d ed. 1986), discussed this form of battery:

"In most jurisdictions today battery may be committed by conduct amounting to criminal negligence which legally causes an injury. Some of the cases so holding have spoken in fictional language—generally to the effect that

---

even to an intended battery as a general intent crime and to the aggravated assaults as specific intent crimes.

In a larger sense, it is simply the case that an intent to hit the victim is both more specific than an intent to fire a gun but also more general than an intent to accomplish a robbery thereby. On the spectrum that runs from pulling the trigger to wounding the victim to stealing the wallet, there are three degrees of specificity to the respective intents. Our characterization of an intent as either "general" or "specific" becomes a function, therefore, of which comparison we are making. "General" and "specific" are not absolute terms but relative ones. The difficulty is that, at our present level of sophistication, this relativistic realization seems incompatible with a defense such as voluntary intoxication, for instance, which insists upon identifying the point beyond which the defense will not reach as *the* point that separates, in the abstract, specific intent from general intent. There may be no such point.

for battery one must intend to injure, but that criminal negligence supplies the intent. Now that the principle of battery based upon criminal negligence is well established, it is more accurate to stop using the fiction and recognize this as a separate type of battery from the intent-to-injure type." (footnotes omitted).

R. Perkins, *Criminal Law* 157–158 (3d ed. 1982), discusses the same variety of the common law misdemeanor:

"For battery, as for manslaughter, more is required than ordinary negligence sufficient to support a civil action. But the rule is now well established that conviction of battery can be supported by harm to the person resulting from criminal negligence. Thus if a person has been hurt as a result of an accident caused by defendant's criminally negligent driving of a car, the defendant is guilty of battery." (footnotes omitted).

*See also* L. Hall, *Assault and Battery By The Reckless Motorist*, 31 J.Crim.L. & Criminology 133 (1940); Comment, *Criminal Assault Through Negligence–Bonding Automobile Drivers*, 22 Mich.L.Rev. 717 (1924).

As Perkins, *Non–Homicide Offenses Against the Person*, 26 B.U.L.Rev. 119, 125–126 (1946), points out, the failure to recognize the unintended battery rose out of the failure to recognize the difference between the tort of battery and the crime of the same name:

" 'Battery' is the name given to a tort as well as the name given to a crime. As a tort it is a civil injury giving rise to an action for damages by the person harmed. As a crime it is social harm punished by the state. The same misdeed may be both,—and usually is. But the two are not identical although they have much in common. . . . If one man harmed another, by an unlawful application of force to his person, the name of the common law action was 'trespass for battery' if the harm was intentionally inflicted, and 'trespass on the case' if it resulted from negligence. Hence,—in the law of torts—the word 'battery' was used only where such harm was intentional, although liability also existed where it was negligent.

In criminal law there is no counterpart to the tort distinction between 'trespass for battery' and 'trespass on the case' and hence the word 'battery' is applied to every punishable application of force to the person of another . . ."

L. Hall, *Assault and Battery by the Reckless Motorist,* 31 J.Crim.L. & Criminology 133, 134 (1940), discusses the development of this form of battery, particularly in the context of criminal negligence in the operation of an automobile:

"The law of battery developed during the latter half of the 19th century along common law principles, from intent to recklessness, in the same manner as the law of manslaughter (and in cases of extreme recklessness, of murder) had unfolded two centuries earlier. The coming of the automobile, and the desire of prosecutors for heavier penalties than many reckless driving statutes permit, have done no more than provide numerous modern instances of this development."

The first official recognition in Maryland of unintended battery came with the promulgation of the *Maryland Criminal Pattern Jury Instructions,* No. 4:04 (1986). MPJI–CR 4:04 instructs the jury that the harmful or offensive physical contact may be the result of "an intentional *or reckless* act." (emphasis supplied). The Comment to MPJI–CR 4:04 cites to the aforementioned academic authorities and observes, "There is no requirement for the defendant to intend to cause the injury. It is sufficient that the defendant acted in a reckless or grossly negligent manner."

The first judicial recognition of unintended battery came with *Duckworth v. State,* 323 Md. 532, 540–544, 594 A.2d 109 (1991). The thoroughly researched and well-reasoned opinion of Judge Rodowsky analyzed why the evidence was legally sufficient to sustain a conviction for battery in a case where the defendant was handling a firearm in a criminally negligent manner and unintentionally wounded a child thereby. Judge Rodowsky reasoned:

"[T]he act of pointing a firearm at a nearby human being, without being certain that the weapon will not discharge, generally is sufficiently reckless to support a conviction for voluntary manslaughter where the unintended discharge of the weapon results in death. Similarly, here, where the discharge of the weapon resulted in a wounding short of death, the same degree of recklessness supports the battery conviction."

*Duckworth*, 323 Md. at 542, 594 A.2d 109. *Cf. Mills v. State*, 13 Md.App. 196, 282 A.2d 147 (1971); Annotation, *Homicide By Wanton Or Reckless Use Of Firearm Without Express Intent To Inflict Injury*, 5 A.L.R. 603, 610–619 (1920); 23 A.L.R. 1554, 1556–1557 (1923).

*Duckworth v. State*, 323 Md. at 541, 594 A.2d 109, quoted with approval *Commonwealth v. Hawkins*, 157 Mass. 551, 553, 32 N.E. 862, 863 (1893):

"It is a general rule in criminal proceedings at common law that the defendant cannot be convicted unless a criminal intent is shown, but it is not necessary that he should have intended the particular wrong which resulted from his act.... So, in cases of homicide, the rule is well established, that one who wantonly, or in a reckless or grossly negligent manner, does that which results in the death of a human being, is guilty of manslaughter, although he did not contemplate such a result. His gross negligence in exposing another to a personal injury by intentionally doing the act makes his intention criminal, and supplies all the intent which the law requires to make him responsible for the consequences. This principle is equally applicable to other cases where a personal injury results from a wanton or reckless act which is likely to do bodily harm, or from any gross negligence which causes the danger. In the case at bar, if Mary A. Powers had died from the pistol shot, the defendant, on the facts found by the jury, would have been guilty of manslaughter. As she survived the injury, the same principle now requires a conviction of assault and battery."

*Duckworth v. State*, 323 Md. at 544, 594 A.2d 109, concluded by holding:

> "Thus, the State's theory of the case on the battery charge was legally sound, namely, that Duckworth criminally wounded Mandy by recklessly handling a firearm."

Harm to the person of the victim caused by the defendant's criminal negligence is not the only form of unintended battery. The other is where the harm results unintentionally from the defendant's doing of an unlawful act which is *malum in se*. This variety of unintended battery is discussed by R. Perkins, *Criminal Law* 156 (3d ed. 1982):

> "If the intentional doing of an unlawful act *malum in se* results in the death of another person the killing is either murder or manslaughter according to the common law, as mentioned in the discussion of homicide. In like manner, if such an act results in nonfatal harm to the person of another it constitutes a battery. Thus hitting another with a shot fired unlawfully, in the sense of *malum in se*, is a battery although the injury was quite accidental; and nonfatal harm caused by a gun is a battery even if pulling the trigger was unintentional if the weapon had been intentionally and unlawfully pointed at the person hit." (footnotes omitted).

L. Hall, *Assault and Battery by the Reckless Motorist*, 31 J.Crim.L. & Criminology 133, 135 (1940), refers to the same development:

> "[L]iability for a battery may be imposed for an unintended injury resulting from an unlawful act, where there would have been liability for manslaughter had death ensued." (footnote omitted).

■ What we have in the case of the unintended batteries are two nonfatal, junior-varsity analogues to two similarly blameworthy states of mind in cases of unintended murders and involuntary manslaughters. When unintended harm results from the doing of an act *malum in se*, the resulting crime may be, if death results, unintended murder under the common law felony-murder doctrine or involun-

tary manslaughter under the analogous common law misde-meanor-manslaughter doctrine. If death does not result, there is an unintended battery.

The other set of unintended crimes arises out of criminal negligence. The unintended harm, if death results, may be unintended murder if the indifference to the consequences is sufficiently wanton and reckless to constitute depraved-heart murder. If the state of mind is less than depraved but still a case of gross criminal negligence, it is involuntary manslaughter. At the nonfatal level, it is unintended battery.

An intended battery is, by definition, a specific-intent crime. An unintended battery, on the other hand, requires only a general intent to do 1) the criminally negligent act or 2) the unlawful act, with no thought being necessary as to the consequences of such act.

\* \* \*

These then are the various forms of common law assault and the various forms of common law battery with which the case law must contend. One may as well attempt to trisect an angle or to carry out Pi to the last decimal place as to provide a single definition for these plural phenomena. Attempts to do so have produced numerous misstatements and half-truths. Those misstatements and half-truths should be laid to rest.

### Half–Truth No. 1:

### "Assault Is An Inchoate Crime"

The half-truth "assault is an inchoate crime" is frequently heard. Underhill, *Criminal Evidence* § 684 (5th ed. 1957); *Luther v. State*, 177 Ind. 619, 624, 98 N.E. 640, 641 (1912); *People v. Lilley*, 43 Mich. 521, 525, 5 N.W. 982, 985 (1880). The Maryland case law does appear to be free of this verbal lapse.

When, as previously discussed, the word "assault" is used as a synonym for "battery" or as a synonym for the combination "assault and battery," it obviously is not an

inchoate crime. It is or it includes a fully consummated battery.

Even in its more restricted connotations, however, eschewing any suggestion of a consummated battery, it *both is and is not* inchoate. As an attempted battery, it is, of course, inchoate. All attempts are inchoate. It is, by definition, an inchoate battery. In its other manifestation, that of placing the victim in reasonable apprehension of an imminent battery, it is, however, in no sense inchoate. It is a fully consummated crime in its own right.

R. Perkins, *Criminal Law* 160 (3d ed. 1982), gives the clear explanation for how this misunderstanding, or half-truth, first entered the legal literature:

"The fact that the original criminal assault was an attempt to commit a battery and nothing else is the reason behind the oft-quoted comment that an attempt to commit an assault is unknown to the law.... *The same fact accounts for certain other statements such as that an assault is an inchoate battery, ...*" (emphasis supplied) (footnotes omitted).

### *Half–Truth No. 2:*

### *"Assault Requires A Specific Intent to Commit A Battery"*

An incomplete conceptualization of the common law crime of assault has also given rise to the now commonplace half-truth that "assault requires a specific intent to commit a battery." Assault is, of course, a specific intent crime, but the thing intended is not necessarily the commission of a battery. An assault of the attempted-battery variety does indeed involve, by definition, a specific intent to commit the battery. An assault of the threatening variety, on the other hand, does not necessarily include any such intent. It is enough that the assailant intends to place the victim in reasonable apprehension of an imminent battery, even if the assailant possesses the diametric specific intent *not* to commit the threatened battery.

### *Half–Truth No. 3:*
### *"Every Battery Includes An Assault"*

The half-truth that "every battery includes an assault" permeates the Maryland case law. *Leatherberry v. State,* 4 Md.App. 300, 305, 242 A.2d 599 (1968); *Price v. State,* 5 Md.App. 127, 130, 245 A.2d 600 (1968); *Lyles v. State,* 10 Md.App. 265, 267, 269 A.2d 178 (1970); *Taylor v. State,* 52 Md.App. 500, 504, 450 A.2d 1312 (1982).

The idea that those half-truths are attempting to communicate, of course, is that every *intended* battery includes an assault. An *intended* battery includes, by its very nature, an antecedent attempt, which is a form of assault.

An unintended battery, on the other hand, does not include such an attempt (or assault) lest it lose its very character of being unintended. An unintended battery, moreover, normally will not include an assault of the intended frightening variety. In rare instances it could, as where in the course of an intended threatening a gun goes off by accident or a frightened victim leaps from a window and suffers harm. Except in such Ripleyesque instances, however, an unintended battery will not include an assault of either variety.

Perkins, *An Analysis of Assault and Attempts to Assault,* 47 Minn.L.Rev. 71, 87–88 (1962), addresses this half-truth and how it came to be:

> "A problem related to attempt to assault arises out of the age-old assertion that every battery includes an assault. This was a logical conclusion when a criminal assault was simply an attempt to commit a battery and a battery was assumed to be a personal harm perpetrated intentionally.... It has long been recognized, however, that a criminal battery may be unintentional, as where personal injury results from criminal negligence or from the perpetration of an unlawful act malum in se.
>
> This seems to suggest that a battery could be committed without an assault." (footnotes omitted).

### Half-Truth No. 4:
### "There Cannot Be An Attempted Assault"

The half-truth that "there cannot be an attempted assault" is deeply entrenched. "As an assault is an attempt to commit a battery, there can be no attempt to commit an assault." 1 Wharton, *Criminal Law and Procedure*, 154, § 72 (Anderson ed. 1957). "There can be no such offense as an 'attempt to attempt' a crime. Since a simple assault is nothing more than an attempt to commit a battery, and aggravated assaults are nothing more than attempts to commit murder, rape, or robbery, an attempt to commit an assault, whether simple or aggravated is not a crime." Clark & Marshall, *Crimes* 218 (6th ed. 1958). *Accord,* L. Hochheimer, *Crimes and Criminal Procedure* § 266 (2d ed. 1904).

■ Such a misconception obviously results from the misperception of the common law crime of assault as an attempted battery and nothing else. We ourselves fell into precisely this error in *Christensen v. State,* 33 Md.App. 635, 643, 365 A.2d 562 (1976):

> "There is no such crime as an attempt to commit an assault.... Indeed, assault is an attempt ... Patently, then, the third count in part asseverated a non-existing crime, *i.e.,* an attempt to commit an assault or, reduced to its actual meaning, an attempt to attempt." (footnote and citations omitted).

May there be an attempted assault? The answer is obviously both "no" and "yes." There may not, of course, be an attempted assault of the attempted-battery variety. That type of assault is already inchoate and there may not be an attempted attempt.

Where the assault, on the other hand, is of the intent-to-frighten variety, there is no reason whatsoever why there cannot be an attempt to commit it. One attempts to put a victim in reasonable apprehension of an imminent battery, but, for some reason, the victim (unconscious, blind, deaf) fails to apprehend the danger. The assault that was con-

templated was not of an inchoate crime but of a fully consummated crime. It, therefore, like any other crime may be attempted as long as the normal prerequisites of attempt law are satisfied. It would not be an attempted attempt, which is the only thing that gave rise to the old cliche in the first place.

In those jurisdictions, such as Maryland, that recognize the former tort of assault as a present form of criminal assault, the familiar cliche is indeed simply a half-truth. R. Perkins, *Criminal Law* 168 (3d ed. 1982), explained:

> "From what has been said, it is apparent that reference may be made to an 'attempt to assault' without logical absurdity. There is nothing absurd in referring to an attempt to frighten, which would constitute, if successful, a criminal assault in most jurisdictions." (footnote omitted).

*　*　*　*　*　*

As we turn to the case at hand, it is against the backdrop that Assault and Battery, Combined, are by no means the simple ABC's of criminal law.

### The Battery In Issue:

The present case involves one of those paradoxical situations where the physical battery of the victim not only did not embrace but was actually far less serious than an assault upon that victim during the same time frame that did not involve any ultimate application of force. The battery conviction was under the sixth count. Upon that conviction, the appellant received a sentence of six years. We meticulously distinguish that conviction on the sixth count from the separate conviction on the fifth count, charging assault alone, for which the appellant received a consecutive sentence of ten years.

The sixth count itself literally charged the classic combination of "assault and battery" as it alleged that the appellant "did make an assault upon and did batter Sharon Lynn Herz." That is the garden variety assault and bat-

tery combination. The battery was of the ordinary intentional sort, involving a specifically intended and attempted application of physical force to the body of the victim. As such, it comprehended the inchoate attempt (assault) and the immediate consummation of that attempt (battery) in one intertwined totality. That assault, obviously of the attempted-battery variety, was, as a matter of course, subsumed within its complementary and consequential battery for purposes of pleading, verdict and sentencing. It is to be carefully distinguished from the separate charge of assault drawn under the fifth count.

The gravamen of that assault-and-battery conviction under the sixth count was the physical harm literally inflicted upon the body of Sharon Lynn Herz. It embraced no other variety of trauma, for battery never does. To analyze the extent of that battery, therefore, we must set out the full extent of all physical touching involved.

.The entire criminal episode took place at Sharon Herz's apartment in Crisfield on May 13, 1990 between approximately 8:30 P.M. and 11:50 P.M. Ms. Herz had known the appellant for almost four years, since the summer of 1986. For a time, the two of them lived together in Baltimore City. Ms. Herz bore a daughter, Brittany, to the appellant. In May of 1988, two years before the crimes involved in this case, Ms. Herz and the appellant separated. Ms. Herz moved in initially with her sister on Maryland Avenue in Baltimore and subsequently moved to her apartment in Crisfield.

The appellant never lived with Ms. Herz in Crisfield. On several occasions, he had been permitted to come down and visit his daughter Brittany. He never stayed overnight and was never given a key to the apartment. Approximately nine months before May 13, Ms. Herz firmly admonished the appellant never to come again to her apartment. During the nine-month interim that followed, she neither saw him nor talked to him.

On May 13, Ms. Herz left for her job, as a nurse, at approximately 6:30 A.M.  She dropped off Brittany at her employer's day-care center.  She got off from work at approximately 7:30 P.M., picked up Brittany and the two of them returned home.  Ms. Herz gave Brittany her bath and put her to bed.  She then performed a few miscellaneous chores about the apartment and took a shower.  As she walked downstairs from her shower, the time was about 8:30 P.M.  As Sharon Herz turned the corner into her living room, she saw the appellant standing in front of her.  In a subsequent statement to the police, the appellant stated that he had pried the door open with a knife.  In his testimony, he claimed that he had climbed in through an open window.  In either event, Sharon Herz was then required to remain in the apartment, under the appellant's compulsion, for approximately the next three-and-a-half hours.

Three times during that period—once early, once in the middle and once late—the appellant perpetrated a literal battery upon her.  Neither the indictment nor the jury instructions nor the arguments of counsel nor the verdicts attempted to make any distinction on a time line between those three discrete applications of physical force.  Neither do we.  They occurred in the course of a single, albeit protracted, criminal episode and may well be treated as a single battery.  The critical distinction is not on the time line but, rather, in the nature of the respective harms inflicted.

The first installment of the battery occurred as soon as Ms. Herz saw the appellant standing in her living room.  She immediately screamed.  As she went to scream a second time, he capped his hand over her mouth, pushed her against the wall, and ordered her "to stop screaming and to be quiet."  Effectively gagging his victim with a hand over her mouth and pushing her against a wall was a quintessential battery.  What then followed for the next few hours, to be more fully discussed hereinafter, constituted criminal conduct other than a battery.

The second installment of the battery occurred an hour or two later as Sharon Herz's brother-in-law, Jay Freeman, stood at the front door of the apartment. The appellant initially stood behind the door and, pointing a gun at Ms. Herz, directed her to get rid of her brother-in-law. In the course of the confrontation, however, the appellant moved into the open doorway to make his point more forcefully. As he did so, he pressed the barrel of the gun into the right side of Ms. Herz's body as he simultaneously placed his left arm around the upper part of her body. Jay Freeman then obeyed the appellant's direction to leave, asking the appellant, "Well, just don't hurt her. Calm down, don't hurt her." Putting Ms. Herz in a wrestler's hold with his left arm while pressing a gun barrel in her ribs was also a quintessential battery.

The third and final installment of the battery occurred near the end of the criminal episode, as the police arrived at the apartment and faced down the appellant. The appellant had already ordered Ms. Herz to the top of the stairs, where he and she sat on the top step facing the police in the doorway below. In the course of the standoff, the appellant with his left hand had pressed the barrel of the gun against Ms. Herz's temple and locked his right arm around her neck. That also constituted a classic battery.

As Judge Long instructed the jury on the battery charged under the sixth count, it was very clear that that charge was concerned exclusively with the subject of "offensive physical contact":

"The defendant is also charged in Count 6 with battery. In order to convict the defendant of battery, the State must prove, 1) that the defendant caused offensive physical contact with Sharon Lynn Herz, 2) that the contact was a result of an intentional or reckless act of the defendant and was not accidental, and 3) that the contact was not legally justified or consented to by Sharon Lynn Herz."

That concept was, moreover, precisely what the prosecuting attorney explained to the jury on the subject of battery: .

"Let's talk about the battery. I don't think there's any question about her being battered. Now, she's not battered to the point that she was greatly beaten or any great physical harm came to her but he held onto her and he pulled on her. She couldn't move. She had no freedom and that constitutes battery, too."

### *The Assault in Issue:*

The assault charged under the fifth count, by contrast, was no mere attempted or inchoate form of battery. That other (attempted-battery) variety of assault was alleged in the distinct sixth count and was properly subsumed in the battery conviction. The fifth count alleged a far more serious offense than that involved in the sixth count. It was the deliberate placing of Sharon Herz in reasonable apprehension of having a bullet fired into her head. Judge Long's instructions on the fifth count (with one minuscule lapse) clearly dealt with the deliberate threatening variety of assault. The gravamen of the offense was the apprehension or fear (or terror) generated in the mind of the threatened victim:

"The defendant is charged with assault. *An assault is any intentional attempt to place another in reasonable apprehension of an immediate injury. In order for a person to commit an assault, there must be an intent to intentionally place another in reasonable apprehension of an immediate injury, 2) an overt act more than mere words, 3) apparent ability to inflict injury, and 4) fear.* Any attempt to apply the least force to the person of another constitutes an assault. [The preceding sentence, of course, has no business here, for it deals with the other variety of assault.] It is not necessary that there should be a specific purpose to do a particular injury. The intent which is an essential element of the offense of assault is the general intent to do the act which constitutes the assault. There need be no actual touching or doing of bodily harm to the person of another to constitute an assault. There must be an act and not

merely a menace. Violence must have been threatened or ordered." (emphasis supplied).

Notwithstanding the one-sentence lapse, the clear and dominant thrust of that instruction dealt exclusively with the placing-in-fear variety of assault. Where the pleadings alone might leave some doubt as to which variety of assault the jury returned a conviction upon under the fifth count, the judge's instructions are very helpful in resolving any ambiguity. In dealing with a not dissimilar ambiguity in *Snowden v. State*, 321 Md. 612, 619, 583 A.2d 1056 (1991), the Court of Appeals observed that "had it been a jury trial we could have looked to the judge's instructions in hope of illuminating the rationale behind the verdicts."

In the State's Attorney's closing argument to the jury, it was equally certain that the assault he was talking about was of the threatening or placing-in-fear variety:

"That brings us up to the assault charge. The mere pointing of that gun at any part of her body and putting her in fear is enough for assault."

As the sentencing reflected, the placing of Sharon Herz in literal fear of her life was unquestionably the most serious charge for which the appellant was convicted. The relative gravity of various charges is something that has to be determined on an *ad hoc* basis and does not lend itself to resolution in the abstract. Compared to the threat to her life, the breaking and entering by the former live-in boyfriend was secondary. Being confined for almost three-and-a-half hours was also, compared to the threat to life, relatively secondary. Clearly secondary as well was the physical touching actually suffered.

The evidence overwhelmingly demonstrated that the appellant deliberately placed Ms. Herz in fear of her life. Immediately after she confronted him in her living room, he pushed her against the wall and told her to stop screaming. As she started crying, he told her to sit down on the floor. It was then that he lifted up his shirt and revealed, stuck in the front of his pants, a .38 revolver. From that point on,

the conversation between them continuously reverted to the question of what he was going to do with the gun and whether he was going to harm her. For most of the time, the appellant took the gun from his pants and held it in his hand. The first time he took the gun out, Ms. Herz asked him what he was going to do with it and "he kept saying he didn't know and he was holding it then." As she attempted to reason with him, she pointed out that he would get in trouble for breaking the terms of his probation. His reply heightened her anxiety as he stated "that he couldn't make probation anyway so it didn't matter what he did. We were going back and forth. Then I asked him, what are you going to do, you couldn't keep me there forever and was he going to hurt me and he said he didn't know."

The appellant himself recognized that the trauma he inflicted on Sharon Herz was not so much physical as psychic. In the course of his statement to the police, he observed:

"Sharon came out of the shower. Sharon got dressed for bed and also came downstairs where I scared the shit out of her."

At one point during the confinement, the telephone rang. Ms. Herz explained that if she didn't answer it, the caller would know that something was wrong. The appellant then let her answer but kept the gun pointed toward her while she was on the phone. When, shortly thereafter, Ms. Herz's brother-in-law showed up at the door, the appellant stood behind the door with the gun trained on her. A minute or so into that conversation, he moved into the doorway and held her with one arm, while pressing the gun barrel against her with his other hand. The appellant terminated this brief encounter with Jay Freeman with the conditional threat, "If you don't go to the police, I won't hurt her." Freeman assured him that he was only going to work. The appellant repeated, "Just don't go to the police and she won't get hurt."

Ms. Herz's apprehension grew as the appellant locked the door. "He started getting shaky and he was nervous and I

was starting to cry." Ms. Herz warned him that this might be his last chance to leave and he replied, "I'm not leaving, they'll get me anyway." The picture created was of a desperate and emotionally-distraught man who thought he had nothing to lose by killing her.

When the police team arrived at the apartment at 11:50 P.M., a deadly face-down occurred, during every split-second of which Sharon Herz's life hung in the balance. When the first knock at the door occurred, the appellant ordered Ms. Herz upstairs. When she initially demurred, he cocked the gun and pointed it at her and reiterated, "Yes, we're going upstairs." At the top of the stairs, the appellant positioned her between himself and the police, using her as a human shield. As the police at the foot of the stairs trained their guns on him, he held his gun at Ms. Herz's temple.

The threatened and imminent battery that Sharon Herz feared, but which fortunately never came to pass, was not the appellant's shoving of her against a wall or his hand across her mouth or his arm about her neck and shoulder. It was the terrifying dread that in the next split-second, a bullet could implode into her skull:

"We went back and forth and I asked him if the police came in, would he please throw the gun down and he kept saying that they had to take him out in a box. He would not go back to jail and, you know, he was sitting behind me so I was sitting between him and the police. I was crying, I was afraid Brittany was going to get hurt and he said no one's going to get hurt because they're not going to come after me with you in front of me and all this.

So the police came in and they were pointing a gun at him and that's when he held the gun up to my head. The left hand had the gun to this temple, the police, and his right arm around my neck. And him and the police yelled back and forth to each other for a while and then he finally threw the gun down and I ran into my daughter's room.

Q: Why did you run?

A: I was afraid he'd pick the gun back up again or I was afraid someone was going to start shooting. I was scared."

The threatened killing that never took place was on a plane far transcending the relatively trivial wrestling that did take place and certainly was not subsumed within it.

At the sentencing hearing, it was clear to all parties that the appellant's major crime had been his placing of Sharon Herz in fear of her life. The Assistant State's Attorney argued:

"He stayed there apparently all day, took a shower, washed some of her clothes and when she came home that evening he spent some time in the bedroom with a child *and, just literally, thereafter scared her to death, for lack of a better word, scared the hell out of her.* Even to the point that when the police came and whether we believe Sharon Herz or not, Mr. Lamb doesn't want us to, but the police officer clearly indicates that he saw her on top of the steps and Mr. Lamb next to her with a gun to her head which turned out to be a loaded .38 revolver.

*There's no question about the fear that was in that woman. I think any reasonable person would have been scared to death.* I think what he did is completely uncalled for. There's just no justification for it. I think when you balance out the crime, the things he's charged with, he deserves a substantial amount of time of incarceration. I don't know how you're going to avoid it.

The State would ask you to lock this man up for a long period of time." (emphasis supplied).

As Judge Long prepared to impose the sentences, he summed up the case against the appellant. His major concern was not with the literal battery that took place but the threatened killing that did not:

"He holds a gun to her head some distance. I can't imagine a more horrifying experience for this woman and thank goodness for the quick action, the competent action

of the Crisfield Police Department, particularly Officers Tyler and Morgan, we were prevented from finding ourselves into a more difficult situation whereby perhaps this lady might have been killed ..."

*Cf. Snowden v. State,* 321 Md. 612, 619, 583 A.2d 1056 (1991).

■ Assault under the fifth count will not merge, as a lesser included offense, into battery under the sixth count for either of two reasons. As an abstract proposition, assault of the threatening variety is not "the same offense" as the battery thus threatened, within the contemplation of *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Assault of the attempted-battery variety, of course, is a lesser included offense within its greater inclusive offense of intended battery, for it possesses no legal element of its own. Assault of the threatening variety, on the other hand, possesses a required element—the reasonable apprehension in the mind of the victim—not possessed by battery. Battery, for its part, possesses a required element—the offensive touching—not possessed by assault. Double jeopardy law according to *Blockburger* would never, therefore, mandate a merger of an assault into a battery when the assault is of the threatening variety.[6]

---

**6.** Admittedly, a more difficult question would be posed if the threatened shooting (assault) were followed by an actual shooting (battery). There, a merger of the threatening conduct into the physical consummation of the threat would not, under federal constitutional law, be mandated by *Blockburger.* Under Maryland law, on the other hand, it might well be required under the extended "rule of lenity" recently promulgated by the Court of Appeals in *White v. State,* 318 Md. 740, 744–746, 569 A.2d 1271 (1990) and *Williams v. State,* 323 Md. 312, 321–322, 593 A.2d 671 (1991).

Analytically, the situation would be further muddied by the fact that where an apprehended threat is then successfully carried out, the antecedent assault is present in both of its manifestations. It is, at the same time, both an attempted battery and a threatened battery. The first would merge under the Federal Constitution. The second would merge only under Maryland's extended "Rule of Lenity." It is not a simple subject.

Quite independently, the assault conviction will not merge into the battery conviction under the particular facts of this case because the battery that was threatened under the assault (fifth) count was not the same as the battery that was consummated under the sixth count. The threatened battery never took place and there was nothing, therefore, into which the antecedent threat might properly merge, even if merger were otherwise appropriate.

### *False Imprisonment*

The assault conviction and the battery conviction are separate and distinct and will not be merged. Our attention now must turn to the third entrant in this merger/nonmerger sweepstakes—false imprisonment. The appellant was convicted of false imprisonment under the seventh count and sentenced to a term of six years, to be served consecutively with all other sentences.

False imprisonment, like assault and like battery, is a common law misdemeanor. The punishment for false imprisonment, like that for assault and for battery, is the common law punishment, vested in the virtually unfettered discretion of the sentencing judge save only that it not be cruel and unusual. R. Perkins, *Criminal Law* 224 (3d ed. 1982), sets out its basic elements:

"False imprisonment, sometimes called false arrest, is the unlawful confinement of a person. It results from any unlawful exercise or show of force by which a person is compelled to remain where he does not wish to remain or go where he does not wish to go. It is a common-law misdemeanor." (footnotes omitted).

The Court of Appeals provided its fullest exposition of false imprisonment in the case of *Midgett v. State*, 216 Md. 26, 38–39, 139 A.2d 209 (1958) in the course of distinguishing it from kidnapping:

"At common law, the offense of kidnapping was the forcible abduction or stealing away of a person and sending him into another country. 'It was regarded as an aggravated form of false imprisonment, since it embraced

all of the elements of that offense, with the *additional* element of carrying the victim out of his own country and beyond the protection of its laws.' Although at common law, the accused had to carry the person kidnapped into *another country* before he was subject to prosecution for kidnapping, statutes concerning the offense in this country have usually provided that both *intra-state* as well as *inter-state* kidnapping are felonies and severely punishable. False imprisonment, which is punishable as an aggravated assault, is merely the unlawful detention of a person against his will. Although false imprisonment in most states is punishable by statute, it is a common law offense, and, in the absence of a statute, is punishable as such, as it is in this State." (citations omitted) (emphasis in original).

*See also Street v. State,* 307 Md. 262, 265–266, 513 A.2d 870 (1986); *Hunt v. State,* 12 Md.App. 286, 309, 278 A.2d 637 (1971).

Maryland Pattern Jury Instructions—Criminal 4:13 defines false imprisonment:

"The defendant is charged with the crime of false imprisonment. False imprisonment is the confinement or detention of a person against that person's will, accomplished by [force or threat of force] [deception]. In order to convict the defendant of false imprisonment, the State must prove:

(1) that the defendant confined or detained (*victim*);

(2) that (*victim*) was confined or detained against [his] [her] will; and

(3) that the confinement or detention was accomplished by [force or threat of force] [deception]."

■ False imprisonment is, thus, an unlawful confinement or detention brought about by the instrumentality, *inter alia,* of either force or threat of force. Although there are other possible catalytic agents for the unlawful

confinement, such as fraud[7] or a false claim of legal authority, false imprisonment is most frequently the product of either an assault or a battery. Like the compound larceny we know as robbery, it may be accomplished by either of those instrumentalities.

On the issue of required merger, the analogy of false imprisonment to robbery is most helpful. Robbery, of course, is larceny accomplished by 1) force or 2) threat of force. False imprisonment is confinement accomplished by, *inter alia*, 1) force or 2) threat of force. The appellant is, therefore, quite correct that the false imprisonment for which he was convicted under the seventh count is a greater inclusive offense embracing within it either 1) the battery for which he was convicted under the sixth count or 2) the assault for which he was convicted under the fifth count. One of those two was, under the facts of this case, the necessary instrumentality for the false imprisonment.

*Either may have been but both were not.* The definitional requirement of force (battery) *or* threat of force (assault) is in the disjunctive. The fact that two instrumentalities were used where one would suffice renders one of them superfluous for merger purposes. In his concurring opinion in *Massey v. State*, 7 Md.App. 615, 618–619, 256 A.2d 614 (1969), Judge Orth, in the context of a robbery conviction, distinguished assault as a predicate instrumentality from battery as a predicate instrumentality. "Where there is no putting in fear there must be actual violence but where there is actual violence there need be no putting in fear.... It appears then that actual violence may be equated to a battery and intimidation to an assault." *Massey*, 7 Md.App. at 619, 256 A.2d 614. *See Cottrell v. State*, 1 Md.App. 520, 522, 231 A.2d 919 (1967); *Tender v. State*, 2

---

7. In *Watkins v. State*, 59 Md.App. 705, 722–725, 478 A.2d 326 (1984), Judge Wilner thoroughly analyzed the historic relationship between kidnapping and false imprisonment and concluded, for this Court, that one of the instrumentalities for the confinement or detention that is the gravamen of false imprisonment may, indeed, be fraud or deception.

Md.App. 692, 699–700, 237 A.2d 65 (1968). The same considerations in the context of a false imprisonment case were before us in *Hunt v. State,* 12 Md.App. 286, 310–311, 278 A.2d 637 (1971).

Albeit in the robbery context, such a choice between possibly alternative instrumentalities was before the Court of Appeals in *Snowden v. State,* 321 Md. 612, 583 A.2d 1056 (1991). The robbery there could have been effectuated by an assault standing alone or by a battery standing alone or by the two of them merging into each other. In our case, unlike *Snowden,* we have already eliminated the third possibility and determined that the assault conviction and the battery conviction before us did not merge. The Court of Appeals stated the problem articulately:

> "Robbery is a compound larceny. It is a larceny from the person accomplished by *either* an assault (putting in fear) *or* a battery (violence). Therefore, *either combination produces a robbery.* When such a 'multi-purpose' crime is involved, we refine it by examining the alternative elements relevant to the case at issue." (emphasis supplied).

*Snowden,* 321 Md. at 618, 583 A.2d 1056.

*Snowden* took its lead from *Nightingale v. State,* 312 Md. 699, 542 A.2d 373 (1988), which first dealt with the phenomenon that it referred to as a "multi-purpose" crime. A "multi-purpose" crime, where the greater inclusive crime may employ either of two lesser crimes as its effectuating modality, does not lend itself to simple *Blockburger* analysis. That is why it, and *Snowden,* refer to the need for further analytic refinement to examine which of the alternative modalities is relevant not in the abstract but in the context of the particular case at hand.

The issue in *Snowden* was whether the effectuating battery and the effectuating assault were separate, so that only one of the two would merge, or were one and the same, so that they would merge into each other before merging, in turn, into the robbery. There were not enough

clues or guidelines present for the *Snowden* Court to resolve that ambiguity, forcing it to turn to the "rule of lenity" in such a case of doubt. *Snowden,* however, clearly framed the question, both before it and in the analogous context of a false imprisonment conviction before us:

> "We are faced with a similar ambiguity here. We do not know whether the robbery charged was based on battery as a lesser included offense or on assault as a lesser included offense with the battery considered separate."

*Snowden,* 321 Md. at 619, 583 A.2d 1056.

■■■ As we have already exhaustively discussed, using various clues and guidelines (one of which was described in *Snowden,* at 321 Md. 619, 583 A.2d 1056), it is clear that the assault and the battery are separate and distinct from each other and do not merge. Therefore, one of the two will merge into the conviction for false imprisonment but the other will not. It is a question of choosing the more likely candidate.

In terms of which of the two will merge, it is a matter of indifference both to double jeopardy law and to sub-constitutional merger law. Both of those legal doctrines are concerned with avoiding multiple punishment. Either possible merger adequately accomplishes that end. Merger is essentially a sentencing problem, not a verdict problem. *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); *Mauk v. State,* 91 Md.App. 456, 462–473, 605 A.2d 157 (1992); *cf. State v. Hawkins,* 326 Md. 270, 290–291, 604 A.2d 489 (1992).

Every aspect of this trial—the evidence, the jury arguments, the judge's instructions, the presentence arguments, the judge's explanation of the sentences, the sentences themselves—combine to make it indisputably clear that the major crime for which the appellant was convicted was his deliberate placing of Sharon Herz in fear of losing her life. The jury instructions focused upon and highlighted the assault charge. In terms of whether a criminal charge is

the centerpiece of the case or a mere incident of something else, the words of the Court of Appeals in *Snowden v. State,* 321 Md. at 619, 583 A.2d 1056, are pertinent: "[H]ad it been a jury trial we could have looked to the judge's instructions in hope of illuminating the rationale behind the verdicts." We do that in this case.

The assault received the ten-year sentence, beside which the breaking and entering, the actual battery and the false imprisonment all paled into relative insignificance, as was apparent throughout the trial. The assault under the fifth count was obviously no mere instrumentality in bringing about an unlawful confinement. It was rather the case that the false imprisonment was a mere incident of it.

The battery, on the other hand, was nothing more than an instrumentality of the confinement. As we have discussed, the battery consisted of three discrete instances. Not one of them involved any effort to harm or to punish the victim as such. It was the necessary force employed to keep her from leaving the apartment. When Sharon Herz first saw the appellant and screamed, he covered her face and pushed her to the wall. No further battery occurred until the door was opened upon the arrival of Ms. Herz's brother-in-law. On that occasion, with flight again a possibility, the appellant placed his left arm around his victim's upper body, in a half-Nelson, to insure that she did not leave. The third and final instance of actual battery occurred when the door was opened a second time upon the arrival of the police. The appellant kept Ms. Herz directly in front of him at the top of the stairs by locking his right arm about her neck. The assistant state's attorney, in closing argument, captured the relative significance of the battery:

"Now, she's not battered to the point that she was greatly beaten or any great physical harm came to her but he held onto her and he pulled on her. She couldn't move. She had no freedom and that constitutes battery, too."

It is clear that the batteries were never intended to inflict harm or offense as such. Sharon Herz was never hit,

kicked, slapped or cut. The purpose was not to harm her but to maintain her unlawful confinement. The sentence imposed for the battery was precisely the same as the sentence imposed for the false imprisonment. Aside from the confinement which it effectuated, the battery really did not amount to anything. The assault, by contrast, in terms of the massive psychic harm that it inflicted, possessed a gravity that far transcended the coincidental confinement.

We hold that the conviction for battery should, as a lesser included offense, be merged into the conviction for false imprisonment and that the separate six-year sentence for battery should, therefore, be vacated.

*JUDGMENT OF CONVICTION FOR BATTERY UNDER THE SIXTH COUNT MERGED INTO CONVICTION FOR FALSE IMPRISONMENT UNDER THE SEVENTH COUNT; SENTENCE OF SIX YEARS FOR BATTERY VACATED; ALL OTHER JUDGMENTS AFFIRMED; COSTS TO BE DIVIDED EQUALLY BETWEEN THE APPELLANT AND SOMERSET COUNTY.*