## MELVIN HILL TAYLOR a/k/a Marvin Grant
## v. STATE OF MARYLAND

[No. 22, September Term, 1982.]

*Decided October 6, 1982.*

The cause was submitted on briefs to GILBERT, C. J., and WILNER and GARRITY, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Bradford C. Peabody, Assistant Public Defender,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Philip M. Andrews, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Lawrence Doan, Assistant State's Attorney for Baltimore City,* for appellee.

WILNER, J., delivered the opinion of the Court.

In the early morning hours of June 22, 1980, Sandra Harmon and her friend Cleveland Morton awoke to find their house on fire. They escaped by jumping from a second-story window, as a result of which Ms. Harmon suffered a

fractured pelvis and Mr. Morton dislocated some bones in his foot. Mr. Morton also suffered burns on a hand and forearm.

Appellant was accused of setting the fire. In the Criminal Court of Baltimore he was charged with, and convicted of, (1) arson, (2) assault with intent to murder Harmon, and (3) assault with intent to murder Morton. From these convictions and the thirty-year sentence imposed in consequence of them, he appeals to us claiming that the evidence was legally insufficient to sustain the convictions. We shall affirm.

## (1) *The Facts*

The house that was burned was located at 1027 Bennett Place in Baltimore City. Ms. Harmon, Mr. Morton, and Ms. Harmon's three children — Mia, Kiel, and Kevin — occupied the basement and first and second floors. Ms. Harmon's friends Justin Brown and Frederick Holmes lived on the third floor.

Ms. Harmon testified that she first met appellant in February or March of 1980, when Mia introduced him as her boyfriend. Ms. Harmon did not approve of the relationship because she felt that the 22-year old appellant was "a bit too old" for her 15-year old daughter, and she communicated her feeling to appellant. Undaunted by Ms. Harmon's concern, appellant pursued his relationship with Mia. On one occasion in March, 1980, he held a gun to Mia's head and threatened that "if I left him he'd blow my head off."

In April, Mr. Morton discovered appellant on the fire escape of the home and learned that he had been entering the house in that manner in order to see Mia. Morton told appellant "that I didn't want him coming around there, coming up the fire escape, and that if he wanted to continue to see Mia, that he was to come to the front door. . . ." Appellant responded, "I am not worried about you." Morton then nailed shut all but one of the windows in the house in order to prevent further surreptitious entries by appellant. The one window left unnailed was in Kiel's room; it had a latch on it that could be locked from the inside. On the day before

the fire, however, the Harmon children, while engaged in some "horseplay," broke a pane in that window, and thus the window was capable of being opened from the outside.

The same day — June 21, 1980 — Mia finally told appellant that she "didn't want to see him any more." Ms. Harmon saw appellant later that day when he returned to visit Mia. She made clear that she did not want him to see Mia again "because [Mia] did not want to continue the relationship." Appellant became upset and accused Harmon and Morton of trying to keep Mia from him. According to Ms. Harmon: "When he left he told me I would not live to see light the next day." He "raised his voice and he had a very evil look in his eyes," and "he just rushed out the door." Ms. Harmon sent Mia and the other two children away for the night. At 2:30 a.m., a friend of appellant — one "Poochie" — called and asked where Mia was. Harmon did not tell him. An hour and a half later — 4:00 a.m. — the fire was discovered.

## (2) *Evidence of Arson*

Appellant does not contest the *corpus delicti* — that the burning of 1027 Bennett Place was an act of arson. In any event, that element was clearly established through the testimony of fire investigator Lyman Howe. Appellant's claim of evidentiary insufficiency relates only to the issue of his criminal agency. In particular, he attacks the weight apparently given to two items or categories of evidence linking him with the crime — a piece of mail addressed to him that was found after the fire in Kiel's room and some missing jewelry and soot marks on a dresser in Mia's room.

In late May, 1980, while appellant was away from home, Ms. Harmon picked up some of his mail for him, among which was a district court "rent notice." Ms. Harmon delivered the rent notice to appellant when he returned on June 17. On June 24 — two days after the fire — police investigators discovered the rent notice on the floor of Kiel's room, a few feet away from the fire escape window. Mia testified that the rent notice was not in Kiel's room when she

cleaned that room on June 21. Mia also said that when she departed the home on the afternoon of June 21, she left on her dresser a ring and a watch that appellant had given her. When she returned four hours after the fire, she noticed that those items were gone. She concluded that the items were taken before the fire was set because soot covered the place where they had been, which was not the case with other items that remained on the dresser.

Appellant urges that since the evidence showed that he was at Mia's home *after* the fire, the rent notice could have been left and the jewelry could have been taken at that time. Perhaps so, but the more inculpatory inference is at least equally plausible. The evidence, in our judgment, more than sufficed to permit a rational trier of fact reasonably to conclude that appellant was the one who set the fire.

### (3) *Evidence of Assault*

Appellant's attack on the other two convictions — assault with intent to murder — is a mixed one of law and fact, and it presents a novel legal issue that does not appear to have been squarely decided before. Conceding that the act of setting fire to an occupied dwelling may constitute the crime of attempted murder, he argues that it does not constitute an assault upon the occupants. Absent the assault, he urges, there obviously cannot be an assault with intent to murder notwithstanding his intent in setting the fire.

In *Yantz v. Warden,* 210 Md. 343, 351, *cert. den.* 352 U.S. 932 (1956), the Court of Appeals defined the crime of assault with the terse statement: "The crime of assault is an attempt by force to injure the person of another." In its brevity, that more or less captures the standard definitions of the crime.[1]

---

1. *See, for example,* Clark & Marshall, *Law of Crimes* (7th ed.) § 10.15, used by us in *Woods v. State,* 14 Md.App. 627, 630, *cert. den.* 266 Md. 745 (1972): "A simple assault under common law is typified by an attempt or offer, with unlawful force or violence, to do a corporal hurt to another." *Also Ott v. State,* 11 Md.App. 259, 265, *cert. den.* 262 Md. 748 (1971): "Assault has been defined as any attempt to apply the least force to the person of another." *See also* Hochheimer, *Crimes and Criminal Procedure* (2d ed.), § 254; 6A C.J.S. *Assault & Battery,* § 64.

Although the thought is expressed in different ways, an assault is essentially the prelude to a battery; it is committed when there is either an attempt to commit a battery or when, by an unlawful act, a person is placed in reasonable apprehension of receiving an immediate battery. *See Woods v. State,* 14 Md.App. 627, *cert. den.* 266 Md. 745 (1972); Perkins, *Criminal Law* (2d ed. 1969), pp. 107, 114; *Wharton's Criminal Law* (14th ed. 1979), §§ 179, 180. A completed battery necessarily includes an assault. Clark & Marshall, *Law of Crimes* (7th ed.), § 10.19; *Woods v. State, supra.*

A battery clearly may be committed by indirect means. As stated by Perkins, pp. 108-09:

> "[A battery] may be committed by administering a poison or other deleterious substance, by applying a caustic chemical, or by communicating a disease. It may be perpetrated in even more indirect forms, as by exposing a helpless person to the inclemency of the weather, *or by threatening sudden violence and thereby causing another to jump from a window* or a moving vehicle or other place. Force may be applied to the person of another without actually touching him, as by cutting his clothes while they are on his person. . . ." (Emphasis supplied; footnotes omitted.)

It follows logically that if a battery may be committed by the indirect application of force (or the application of force indirectly) and if every battery necessarily includes an assault, an assault may arise from the threatened or attempted indirect application of force. Such cases are not unknown to the common law.

In *Wood v. Young,* 50 S.W. 541 (Ky. 1899), the court found that a civil assault had been committed by a landlord's agent who entered the home of a holdover tenant and while not actually touching the tenant " 'tried to smoke her out' by removing a lid from the stove, and by pouring water on it, and then going out, and closing and locking the door, and carrying away the key."

In *Clark v. Downing,* 55 Vt. 259, 45 Am.Rep. 612, 613 (1882), the court addressed the question of whether "the striking of the plaintiff's horse [upon which the plaintiff was riding] constitute[d] an assault upon the plaintiff." It concluded that there was such an assault, stating (also at p. 613):

> "It is not necessary to constitute an assault that any actual violence be done to the person. If the party threatening the assault have the *ability, means,* and apparent intention to carry his threat into execution, it may in law constitute an assault. The disposition, accompanied with a present ability to use violence, has been held to amount to an assault. *Where violence is used it is not indispensably necessary that it should be to the person.*" (Emphasis supplied.)

There are a number of British and American cases to the same effect. In *Her Majesty's Advocate v. Keay,* 1 Swin. 543 (Scot. 1837), the evidence showed that the defendant, without just cause, whipped a pony being ridden by a young boy as the defendant was passing in his carriage. As a result of the whipping, the pony bolted and threw its rider. The court concluded that a criminal assault had been committed, Lord Cockburn opining, at p. 546:

> "If [the defendant] had seized the boy in his arms and carried him away, that would most clearly have constituted an assault, and the fact of his having made the pony the instrument of carrying him off makes no difference. The maxim *'qui facit per alium facit per se,'* [2] makes the act of the pony the act of the [defendant]."

*See also Kirland v. State,* 43 Ind. 146, 13 Am.Rep. 386 (1873); *People v. Moore,* 3 N.Y.S. 159 (1888); *Hopper v. Reeve,* 7 Taunt. 699, 129 Eng.Rep. 278 (1817).

---

2. He who acts through another acts himself.

In *Commonwealth v. Stratton,* 114 Mass. 303, 19 Am.Rep. 350 (1873), the defendant was found to have committed a criminal assault when he delivered to his girlfriend some fruit laced with what he thought was a harmless love potion but which, when she ingested it, made her ill. The court said, at p. 351:

> "Although force and violence are included in all definitions of assault, or assault and battery, yet, *where there is physical injury to another person, it is sufficient that the cause is set in motion by the defendant, or that the person is subjected to its operation by means of any act or control which the defendant exerts."* (Emphasis supplied.)

An assault (and a battery) may be committed by means of fire. *See Everhart v. State,* 358 So.2d 1058, *reh. den.* 358 So.2d 1064 (Ala. 1978) — throwing a "molotov cocktail" into a confined area where the victim is standing; *State v. Mathewson,* 498 P.2d 575 (Ariz.App. 1972) — setting fire to one's clothing; *People v. Morgan,* 213 N.W.2d 276 (Mich.App. 1973), *rev. on other grounds* 255 N.W. 603 (1977) — pouring lighter fluid on victim and igniting it.

Given the core definition of assault, and the ability to commit it by indirect means, we can find no meaningful distinction between setting one's person or clothing on fire directly and setting fire to one's house under the circumstances evident here. Asleep in their room at 4:00 in the morning, Ms. Harmon and Mr. Morton were as likely (and intended) to be injured by the fire set in their home as they would if appellant had set the fire to their bed, or their linens, or their clothes. The arson was merely the instrument of appellant's attack on their persons, and thus, in this circumstance at least, the attack on the house was an attack on its occupants. *Cf. Meade's and Belt's Case,* 1 Lew.Cr.Rep. 184, 168 Eng.Rep. 1006 (1823); *Thomas v. State,* 53 So.2d 340, 346 (Ala. 1951).

> *Judgments affirmed; appellant to pay the costs.*