659 A.2d 371

**Adam SCHLOSSMAN,**

v.

**STATE of Maryland.**

**No. 1604, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

June 7, 1995.

---

278

Julia Doyle Bernhardt, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

David Kennedy, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for appellee.

Argued before BLOOM, MOYLAN and ALPERT, JJ.

BLOOM, Judge.

At a bench trial before the Honorable Robert Heller in the Circuit Court for Anne Arundel County, appellant, Adam Schlossman, was convicted of involuntary manslaughter. The court sentenced appellant to seven years imprisonment, with all but eighteen months suspended, appellant being placed on supervised probation for a period of five years. One of the conditions of probation was that two and one-half years thereof be served under "house arrest." In this appeal from that judgment, appellant presents the following issues for our determination:

I. Whether the evidence was sufficient to support appellant's conviction of involuntary manslaughter.

II. Whether the trial court erred in admitting expert testimony without a proper foundation.

III. Whether the trial court admitted improper rebuttal evidence.

IV. Whether the trial court imposed an illegal condition of probation.

## *FACTS*

On an undetermined evening in July 1992, as appellant entered his home in Annapolis, where he lived with Christian Walton, Gene Kirshner, Isaac Kumer, Allan Tucker, and Willis Usilton, he complained about "bums" sleeping in the woods

nearby. Approximately fifteen minutes later, appellant and Usilton left the house with a baseball bat and a flashlight, entered the woods, and proceeded to get into an argument with one of two men there. Appellant pushed one of the men off of the property, but the other man, Arch Baldwin, who was unconscious and appeared to be severely intoxicated, remained in the woods.

Appellant returned to his house and stated that there was someone "passed out in the woods." Usilton, Walton, Theodore Reshetiloff, and appellant then went into the woods to find Baldwin. When they found him, they taunted him, poked him with sticks, urinated on him, and poured paint on him.[1] At one point, Baldwin appeared to open his eyes briefly, but then lost consciousness again. Appellant and his companions rolled Baldwin into a ditch four feet deep, threw stones and a mattress at him, and kicked dirt and trash on him. Baldwin subsequently attempted to crawl out of the ditch but was unsuccessful. Reshetiloff then threw a piece of a cinder block at him. When appellant and the other assailants left Baldwin, he was still alive.

The following day, appellant and Usilton returned to the woods and observed that Baldwin was dead. Later, appellant, Usilton, Reshetiloff, and Walton dug a hole at a location farther in the woods, transported Baldwin's body there, and tried to put it into the hole. To get the body to fit, appellant had to break one of Baldwin's legs with a shovel. After appellant covered the body with dirt, he stated that, if anyone ever told the police what had occurred, he would "take care of them."

Near the end of July, Officer Pete Medley of the Annapolis Police Department received a missing persons report for Arch Baldwin, described as a sixty-two year old man who often slept in the woods. On 5 April 1993, the police searched the area near appellant's home and located Baldwin's body. The

---

1. According to Usilton's testimony at trial, when one of the residents of the house would pass out, occasionally other residents would urinate or throw food on the person, or draw on the person with ink markers.

body appeared to be well preserved and was identified as that of Baldwin through a comparison of fingerprints.

On 7 April 1993, Baldwin's body was examined at the Office of the Chief Medical Examiner in Baltimore. Mario Golle, Jr., M.D., an assistant medical examiner, supervised the autopsy. The autopsy revealed that portions of Baldwin's coronary arteries were almost entirely obstructed by atherosclerosis and that the body had several fractures and lacerations, any or all of which may have occurred post mortem. Initially, Dr. Golle was unable to specify the cause of death because he had not yet received copies of the police report and witness statements. After Officer Medley gave Dr. Golle a copy of the police report and witness statements, Dr. Golle concluded that Baldwin had died of severe coronary artery disease and that the manner of death was homicide. According to Dr. Golle's testimony at appellant's trial, Baldwin essentially died of a "heart attack while involved in an altercation." Dr. Golle also testified that Baldwin was a chronic alcoholic, and had a history of cirrhosis of the liver, alcohol liver disease, delirium tremens, seizures, and chronic obstructive pulmonary disease.

The grand jury charged appellant, in a five count indictment, with manslaughter, accessory after the fact to manslaughter, assault with intent to maim, reckless endangerment, and assault and battery. Prior to trial, the reckless endangerment and assault and battery charges were dismissed. At the conclusion of the trial, which lasted from 14 February to 4 March 1994, the court found appellant guilty of manslaughter but not guilty of assault with intent to maim. The charge of accessory after the fact was dismissed. On 4 May 1994, sentence was imposed and this appeal followed.

## I.

Appellant contends that "the evidence was insufficient to support [his] conviction of involuntary manslaughter" for two reasons. First, he asserts that the State failed to establish that he committed involuntary manslaughter based on the commission of a criminal homicide during the perpetration of

an unlawful act because the State did not prove that appellant committed "an unlawful act dangerous to life." Second, he maintains that the State did not present sufficient evidence establishing that his actions were the legal cause of the victim's death.

When reviewing a question of the sufficiency of the evidence, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Wiggins v. State*, 324 Md. 551, 567, 597 A.2d 1359 (1991) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)); *see also Wilson v. State*, 319 Md. 530, 535, 573 A.2d 831 (1990). "In this regard, under Maryland Rule 8–131(c), we defer to the factual findings of the trial judge in a non-jury case, unless they are clearly erroneous, giving due regard to the opportunity of the trial judge to observe the demeanor of the witnesses and to assess their credibility." *Wiggins*, 324 Md. at 567, 597 A.2d 1359. With these considerations in mind, we shall address appellant's two arguments *seriatim*.

### A. *Unlawful Act Dangerous to Life*

█ Appellant contends that, where a prosecution for involuntary manslaughter is based on the commission of an unlawful act causing death, the act itself must be dangerous to life. Because "there was no evidence [that he committed] an [unlawful] act inherently dangerous to human life," appellant argues, the evidence was insufficient to support his conviction for involuntary manslaughter.

Under Maryland common law, the crime of involuntary manslaughter is divided into three distinct categories. In *Neusbaum v. State*, 156 Md. 149, 155, 143 A. 872 (1928) (quoting 2 *Bishop on Criminal Law.* par. 629), the Court of Appeals characterized the crime as including those cases in which one unintentionally kills another without malice "[1] while needlessly doing anything in its nature dangerous to life, [2] or . . . causes death by neglecting a duty imposed either by

law or by contract, [3] or in the course of committing a crime or even a civil wrong."

These distinct classes of involuntary manslaughter were also set forth in *State v. Gibson*, 4 Md.App. 236, 242, 242 A.2d 575 (1968), as follows:

Involuntary manslaughter at common law has been generally defined as the killing of another unintentionally and without malice (1) in doing some unlawful act not amounting to a felony, or (2) in negligently doing some act lawful in itself, or (3) by the negligent omission to perform a legal duty. See 1 *Warren on Homicide* (Perm.Ed.1938), 420, 421; 26 Am.Jur. *Homicide*, Sec. 18, 44; 40 C.J.S. *Homicide*, Sec. 55, and cases therein cited. To this basic definition other authorities add the qualification, as to the first class of involuntary manslaughter, that the unlawful act be *malum in se*, and not merely *malum prohibitum....* Clark and Marshall, *Crimes* (Sixth Ed.), Sections 10.04, 10.12–10.14; *Perkins on Criminal Law*, pp. 34, 57–61; Wharton's *Criminal Law and Procedure*, (Anderson Ed.), Vol. 1, Sections 289–292, 296, and cases therein cited.

Similarly, in *Wilson v. State*, 28 Md.App. 168, 172, 343 A.2d 537 (1975) (quoting Clark and Marshall, *Law of Crimes* § 10.12 (7th ed. 1967)), we delineated the classifications in the following manner:

1. Commission of a criminal act not amounting to a felony, nor naturally tending to cause death or grievous bodily harm.

2. Omission to perform a legal duty, under circumstances evidencing criminal-culpable negligence.

3. Performing lawful act with criminal culpable negligence.

The first classification of involuntary manslaughter, known as unlawful act involuntary manslaughter or misdemeanor manslaughter, can broadly be stated as occurring where one commits a criminal act not amounting to a felony that unintentionally causes the death of another. This overly simplistic statement of the rule is misleading, however, because the rule's specific requirements hinge upon whether the unlawful

act was *malum in se* or *malum prohibitum.* *See United Life and Accident Ins. Co. v. Prostic,* 169 Md. 535, 539, 182 A. 421 (1935); *Gibson,* 4 Md.App. at 242, 242 A.2d 575. "An offense *malum in se* is properly defined as one which is naturally evil as adjudged by the sense of a civilized community," *Garnett v. State,* 332 Md. 571, 603 n. 12, 632 A.2d 797 (1993); it is an act that is wrongful in itself "without any regard to the fact of its being noticed or punished by the laws of the state." *Black's Law Dictionary* 959 (6th ed. 1990). Unlawful acts that are wrong only because they are prohibited by statute are considered to be *malum prohibitum* acts. *Garnett,* 332 Md. at 603 n. 12, 632 A.2d 797 (citation omitted). In the case *sub judice,* appellant concedes that he committed "unlawful acts." We now must determine whether those acts were *malum in se* or *malum prohibitum.*

As noted *supra,* the victim was passed out in the woods near appellant's home when he was confronted by appellant and his friends. According to Walton's and Usilton's testimony, appellant poked the victim with a stick, urinated on him, and kicked dirt and trash on him. These acts clearly establish that appellant committed a common law misdemeanor battery against the victim. *See Kellum v. State,* 223 Md. 80, 85, 162 A.2d 473 (1960) (stating that any unlawful force used against the person of another, no matter how slight, will constitute battery); *Taylor v. State,* 52 Md.App. 500, 504, 450 A.2d 1312 (1982) (stating that a battery may be committed by the indirect application of force or the application of force indirectly). The State's expert witness, Dr. Golle, testified that the stress induced by the victim's altercation with appellant directly caused the victim to suffer a fatal heart attack. Thus, there was evidence to the effect that appellant's criminal battery caused the victim's death.

■ An intentional battery is an unlawful act that is *malum in se.* *See, e.g.,* LaFave & Scott, *Criminal Law* § 7.13, at 681 (2d ed. 1986). Appellant's acts, however, were not generally what would be considered acts "dangerous to life." Thus, we must determine whether an unlawful act that is *malum in se*

but is not itself dangerous to life can support a conviction for involuntary manslaughter.

That issue was addressed by the Court of Appeals in *Worthington v. State*, 92 Md. 222, 48 A. 355 (1901). In that case, Worthington had been indicted for manslaughter for causing the death of the victim while performing an abortion on her. At that time, performing an abortion was a *malum in se* common law misdemeanor. *Id.* at 237, 48 A. 355. Worthington demurred to the indictment, arguing that "the death of a woman resulting from a criminal abortion upon her, is, at common law, murder, and the indictment ... is defective, because it charges death as the result of the abortion, but charges the defendant with the crime of manslaughter instead of murder." *Id.* at 235, 48 A. 355. His demurrer was overruled, and he was convicted. On appeal, Worthington challenged the overruling of his demurrer.

Initially, the Court of Appeals stated that, because performing an abortion is a misdemeanor, "causing the mother's death in attempting an abortion, is only manslaughter at common law, if the attempt is not made in a way that endangers the mother's life. In that case, it is murder." *Id.* at 237, 48 A. 355 (quoting *Clark's Criminal Law*, p. 161). The Court explained that "[i]f the intent was to kill or grievously injure her the offense is murder. It is manslaughter if the intent was only to produce the miscarriage, the agency not being one from which death or grievous injury would be likely to result." *Id.* (citation omitted). Noting that "death is not now the usual ... consequence of an abortion," and that the recipient is comparatively immune from danger, the Court held that Worthington properly was indicted for manslaughter. *Id.* at 239, 48 A. 355. In reaching that holding, the Court necessarily concluded that, under Maryland common law, a person could be guilty of what was, in effect, involuntary manslaughter, based on the commission of a criminal act that was *malum in se* but not considered to be dangerous to human life.

In *United Life and Accident Ins. Co. v. Prostic*, 169 Md. 535, 539, 182 A. 421 (1935), two robbers beat the victim and

stole his money while he was working in his shop in Baltimore City. Soon thereafter, the victim apparently suffered a non-fatal heart attack. The pain in his chest continued for several weeks and, approximately five weeks later, he died "due to a coronary thrombosis induced by the beating...." 169 Md. at 536–37, 182 A. 421. Prostic, the victim's beneficiary under an insurance policy that provided double indemnity for accidental death if "such death shall not result from homicide," sued for payment under the policy. 169 Md. at 536, 182 A. 421. Appealing from a judgment in favor of Prostic, United Life argued that, because the insured's death was the result of a homicide, Prostic could not recover under the double indemnity provision of the policy.

Holding that the insured was the victim of a criminal homicide, the Court of Appeals stated that the robbers committed involuntary manslaughter at least, and that they may also have committed first or second degree murder. *Id.* at 539–40, 182 A. 421. In reaching its conclusion that an involuntary manslaughter had occurred, the Court stated that

when the person acting has no intention to injure anybody, but death is a result of unlawful action endangering life, there is manslaughter, at least. "It is not necessary that he should have intended the particular wrong which resulted from his act. If he intends to do an unlawful and wrongful act, which is punishable because it is wrong in itself, and in doing it he inflicts unforeseen injury, he is criminally liable for that injury." *Commonwealth v. Hawkins,* 157 Mass. 551, 553, 32 N.E. 862; *State v. Lehman,* 131 Minn. 427, 430, 155 N.W. 399; *Killian v. State,* 184 Ark. 239, 242, 42 S.W. (2nd) 12.

*Id.,* 169 Md. at 539, 182 A. 421.

The Court's language in *Prostic,* albeit dictum, indicates that a defendant who commits an act that is "punishable because it is wrong in itself," that is, *malum in se,* will be criminally liable for the injury caused by his act. The language employed by the Court does not indicate a requirement that the *malum in se* act be one that is dangerous to life to

render the actor criminally liable. We note that the Court did state that "when the person acting has no intention to injure anybody, but death is a result of unlawful action *endangering life,* there is manslaughter, at least." 169 Md. at 539, 182 A. 421 (emphasis added). When viewed in the context of the facts of the case, however, this statement was simply address- ing the fact that, by beating the insured "mercilessly," *id.* at 536, 182 A. 421, the robbers had committed acts that endan- gered life.

We interpret *Worthington* and *Prostic* as establishing that a homicide resulting from the perpetration of a *malum in se* unlawful act not amounting to a felony is manslaughter, re- gardless of whether the unlawful act was "dangerous to life." Because appellant's battery against the victim was a *malum in se* criminal act, we hold that the State was not required to prove that appellant's acts were dangerous to life in order to establish a *prima facie* case of involuntary manslaughter.

Appellant relies on *State v. Gibson,* 4 Md.App. 236, 243, 242 A.2d 575 (1968), *aff'd,* 254 Md. 399, 254 A.2d 691 (1969), in support of his contention that, when a prosecution for involun- tary manslaughter is based on the commission of an unlawful act causing death, the act must itself be dangerous to life, even if the act is *malum in se.* In *Gibson,* we held that the statutory crime of manslaughter by motor vehicle, Maryland Code (1957, 1967 Repl.Vol.), Art. 27, § 388, preempted charg- ing a defendant with "common-law misdemeanor-manslaugh- ter" where the operation of a motor vehicle unintentionally resulted in the death of the victim. 4 Md.App. at 245, 242 A.2d 575. In reaching that holding, this Court recited the following principles governing the common law crime of invol- untary manslaughter:

Involuntary manslaughter at common law has been gener- ally defined as the killing of another unintentionally and without malice (1) in doing some unlawful act not amounting to a felony, or (2) in negligently doing some act lawful in itself, or (3) by the negligent omission to perform a legal duty. See 1 *Warren on Homicide* (Perm.Ed.1938), 420, 421; 26 Am.Jur. *Homicide,* Sec. 18, 44; 40 C.J.S. *Homicide,* Sec.

55, and cases therein cited. To this basic definition other authorities add the qualification, as to the first class of involuntary manslaughter, that the unlawful act be *malum in se,* and not merely *malum prohibitum,* and as to the second and third classes of the offense, that the negligence be criminally culpable, *i.e.,* that it be gross. Clark and Marshall, *Crimes* (Sixth Ed.), Sections 10.04, 10.12–10.14; *Perkins on Criminal Law,* pp. 34, 57–61; Wharton's *Criminal Law and Procedure,* (Anderson Ed.), Vol. 1, Sections 289–292, 296, and cases therein cited.

. . . .

It is likewise clear that the Maryland cases have generally recognized that a charge of involuntary manslaughter at common law could in some circumstances at least be based on the doing of an unlawful act. In *Neusbaum v. State, supra,* the court, in defining a felonious homicide, characterized the crime so as to include those cases where one takes the life of another unintentionally and without excuse "while needlessly doing anything in its nature dangerous to life, or who causes death by neglecting a duty imposed either by law or by contract, or in the course of committing a crime or even a civil wrong." 156 Md. at page 155 [143 A. 872]. To like effect, the court in *Insurance Company v. Prostic,* 169 Md. 535 [182 A. 421], in discussing a felonious homicide, held at page 539 that "when the person acting has no intention to injure anybody, but death is the result of unlawful action endangering life, there is manslaughter, at least."

What appellant relies upon is the following language in *Gibson,* which he refers to as "a rule":

*Neusbaum* and *Prostic* seemingly share a common legal thread—that where a prosecution for involuntary manslaughter is based on the commission of an unlawful act causing death, the act must itself be dangerous to life. As the *Prostic* court observed, if the person causing the death of another "intends to do an unlawful and wrongful act, which is punishable because it is wrong in itself, and in doing it he inflicts an unforeseen injury, he is criminally

liable for that injury" [since] "[t]here are many acts so heedless and incautious as necessarily to be deemed unlawful and wanton, though there may not be any express intent to do mischief, and the party committing them causing death by such conduct will be guilty of manslaughter." 169 Md. at page 539 [182 A. 421].

4 Md.App. at 242–43, 242 A.2d 575 (footnotes omitted).

Appellant's reliance on that passage in *Gibson* is misplaced. As stated *supra*, in *Gibson* we were concerned with whether the statutory crime of vehicular manslaughter preempted the common law in cases where the operation of a motor vehicle results in an unintentional homicide. We did not address what types of acts are encompassed within the phrase "unlawful act" as that term is used in the definition of involuntary manslaughter. Consequently, the "rule" upon which appellant relies is dictum at best.

Furthermore, we disagree with appellant's interpretation of that dictum in *Gibson*. In effect, appellant contends that our statement that the unlawful act "must itself be dangerous to life," *id.* at 243, 242 A.2d 575, refers to all unlawful acts, those unlawful acts that are *malum in se* as well as those unlawful acts that are *malum prohibitum*. To give the Court's language the broad meaning advocated by appellant, however, would conflict with the earlier, more specific, definition of unlawful act involuntary manslaughter enunciated in the case. Specifically, we defined involuntary manslaughter as being "the killing of another unintentionally and without malice (1) in doing some unlawful act not amounting to a felony, . . . ." *Id.* at 242, 242 A.2d 575. We then added the following: "To this basic definition other authorities add the qualification, as to the first class of involuntary manslaughter, that the unlawful act be *malum in se*, and not merely *malum prohibitum*. . . ." *Id.* at 242, 242 A.2d 575 (citations omitted). Viewing the term "unlawful act" in the context of the entire opinion, we interpret it to be referring exclusively to unlawful acts that are merely *malum prohibitum*.

The dictum in *Gibson* upon which appellant relies has been referred to in subsequent cases by both of this State's appellate courts. *See State v. Albrecht,* 336 Md. 475, 499, 649 A.2d 336 (1994) (involuntary manslaughter based on gross negligence in performing lawful act); *Cox v. State,* 311 Md. 326, 331–32, 534 A.2d 1333 (1988) (conviction for attempted voluntary manslaughter); *Cox v. State,* 69 Md.App. 396, 401, 518 A.2d 132 (1986), *aff'd,* 311 Md. 326, 534 A.2d 1333 (1988) (same); *Wilson v. State,* 28 Md.App. 168, 172, 343 A.2d 537 (1975) (involuntary manslaughter based on gross negligence in performing lawful act); *Mills v. State,* 13 Md.App. 196, 201, 282 A.2d 147 (1971), *cert. denied,* 264 Md. 750 (1972) (same). Like the decision in *Gibson,* however, these cases never actually addressed what unlawful acts would suffice to sustain a conviction under the category of unlawful act involuntary manslaughter. Thus, the courts rendering these decisions were never required to analyze or apply the language in *Gibson* that appellant refers to as a "rule," and their citations to *Gibson* add no support to appellant's position in the present case.

*Rolfes v. State,* 10 Md.App. 204, 268 A.2d 795 (1970), is the lone decision in Maryland that involved involuntary manslaughter that was based on a *malum in se* unlawful act and that cited *Gibson* for the proposition that an unlawful act must be dangerous to life to support an involuntary manslaughter conviction. In that case, we concluded that Rolfes's "assault upon her husband with the knife was an unlawful act dangerous to life." *Id.* at 208, 268 A.2d 795. Because appellant's unlawful act was one dangerous to life, it fit neatly into the *Gibson* "rule," whether it was *malum prohibitum* or *malum in se;* it was not necessary for us to scrutinize the "rule" or distinguish between conduct that is merely unlawful and conduct that is punishable because it is wrong in itself in order to affirm the conviction. Because it quoted and relied on the dictum in *Gibson, Rolfes,* like *Gibson,* does not support appellant's position in the case *sub judice.*

## B. *Legal Causation*

Having determined that appellant's unlawful acts did not need to be life threatening in order to form the basis for an involuntary manslaughter conviction under the misdemeanor-manslaughter rule, we shall now address appellant's contention that the State failed to present sufficient evidence establishing that his actions were the legal cause of the victim's death.

Based on the results of an autopsy, the State's expert witness, Dr. Golle, testified that the victim suffered from severe coronary artery disease that rendered him predisposed to a heart attack. That conclusion was supported by the testimony of appellant's expert witness, Dr. Adams, who testified that the victim "had eighty to ninety percent localized blockage in the two main arteries." [2] Prior to trial, Dr. Golle learned from witness statements contained in the police reports that the victim was involved in an altercation in which appellant and others had poked the victim with sticks, urinated on him, poured paint on him, rolled him into a ditch, threw stones at him, and kicked dirt and trash on him. The fact that the altercation did occur was confirmed by the testimony of witnesses presented at trial. Based on this knowledge, Dr. Golle then established the requisite causal relation between appellant's acts and the victim's death by concluding, "with reasonable medical certainty," that the victim suffered a fatal heart attack that was caused by the stress brought on by the victim's altercation with appellant and his friends.

Although appellant presented expert testimony indicating that there were several possible causes of death other than the theory proffered by the State, that testimony only affected the weight to be given to Dr. Golle's testimony; it did not detract from the sufficiency of the State's evidence. The court, sitting as the trier of fact, was free to choose which expert opinion to believe. *See Breeden v. State*, 95 Md.App. 481, 510, 622 A.2d

---

**2.** Dr. Adams, however, characterized the victim's heart disease as being only "moderately severe."

160, *aff'd, remanded,* 333 Md. 212, 634 A.2d 464 (1993). Viewing the evidence in a light most favorable to the State, we hold that the court rationally could have found beyond a reasonable doubt that appellant's acts were the legal cause of the victim's death. *See Wiggins,* 324 Md. at 567, 597 A.2d 1359.

## II.

■ Appellant next contends that the circuit court erred in admitting Dr. Golle's expert testimony regarding the manner and cause of Baldwin's death. Essentially, appellant asserts that Dr. Golle's opinion lacked an adequate foundation because his conclusion that the victim died of a heart attack during the altercation with appellant was based on information that he gathered from inadmissible police reports instead of being based on facts presented in the form of a hypothetical question or facts adduced through testimony.

■ An expert's conclusions must be based upon a legally sufficient factual foundation. *Simmons v. State,* 313 Md. 33, 41–42, 542 A.2d 1258 (1988) (citing *State Health Dep't v. Walker,* 238 Md. 512, 520, 209 A.2d 555 (1965)). "An expert witness, however, need not testify from personal knowledge so long as the opinion is predicated upon facts established in the record." *Shives v. Furst,* 70 Md.App. 328, 341, 521 A.2d 332, *cert. denied,* 309 Md. 521, 525 A.2d 636 (1987) (citations omitted); *see also Consolidated Mechanical Contractors, Inc. v. Ball,* 263 Md. 328, 336–37, 283 A.2d 154 (1971). Moreover, "a trial judge is given broad discretion in ruling on the admissibility of expert testimony. Seldom will the decision in this regard constitute grounds for reversal." *Simmons v. State,* 313 Md. 33, 43, 542 A.2d 1258 (1988) (citations omitted).

In the case *sub judice,* Dr. Golle testified that, in his opinion, Baldwin was the victim of a homicide. Specifically, Dr. Golle stated that the stress experienced by the victim as a result of the altercation with appellant caused him to suffer a myocardial ischemia, which Dr. Golle said was similar to having a heart attack. Dr. Golle testified that he formulated

his opinion as to the cause of the victim's death based on his review of the autopsy and information in the police reports.[3] When asked on direct examination which portions of the police reports he used to formulate his opinion regarding the cause of the victim's death, he stated that he relied on the police reports to establish that the victim was alive when he was involved in a stressful altercation with appellant and others and that he was found dead the following day. When the court later asked him the same question, Dr. Golle acknowledged that he was relying on the witness statements in the police reports that the victim was alive at the time of the "altercation." The court then asked Dr. Golle what he meant by the term "altercation":

> COURT: No, I mean, what was it that you were relying on as being the altercation here and it may be that the word altercation was in the report. I don't know what was in the report but I want to know what it is that you're relying on since you've said that you're relying on something from the report, I want to know what it is that you're relying on to de—that you've characterized as altercation. . . .
>
> . . . .
>
> DR. GOLLE: The hitting him, throwing rocks.
>
> THE COURT: Anything more?
>
> DR. GOLLE: Hitting, pushing.
>
> THE COURT: Was there anything more than hitting him, throwing rocks and pushing him that you're relying upon as being an altercation?
>
> DR. GOLLE: I think the verbal—verbal abuse.
>
> THE COURT: In terms of hitting, . . . is there something more specific about the hitting that you're relying upon in . . . forming your opinion?

---

**3.** Although Dr. Golle acknowledged that he also examined some of the victim's medical records from the Perry Point Medical Center, he stated that they did not affect his opinion as to the manner and cause of the victim's death.

DR. GOLLE: No.

THE COURT: Okay. So you don't know if hitting him in the context of what you're relying upon was hitting him with sharp and numerous blows or hitting him with poking with a stick or hitting him in some other manner; is that a fair—

DR. GOLLE: That's correct, Your Honor. As I said, there are injuries that there's no way to tell if it occurred while he was alive or after he died, because of decomposition.

. . . .

THE COURT: Okay. . . . [I]s the same thing true about the throwing of rocks, do you know anything more about the throwing of rocks, how many rocks, size of rocks or any of that?

DR. GOLLE: No.

THE COURT: Okay. Same with pushing? Don't know the—the frequency of pushing, the manner of pushing?

DR. GOLLE: That's correct, Your Honor.

THE COURT: And is it fair to assume the same with regard to the verbal abuse?

DR. GOLLE: That's correct.

Appellant has not stated, nor have we found, any evidence demonstrating that Dr. Golle's opinion as to the cause of the victim's death was based on facts that were not adduced at trial. Dr. Golle's responses indicate that he did not rely on the specific version of the events set forth in the police reports in concluding that Baldwin was the victim of a homicide. In other words, he did not conclude that the victim died as a result of injuries that he may have sustained after allegedly being hit with stones, trash, paint, and urine, or as a result of any other of the specific acts mentioned in the police reports. In contrast, Dr. Golle based his conclusion on the simple fact that the victim was involved in a stressful "altercation" with appellant and others; whether the victim suffered any specific injuries as a result of the altercation was immaterial to Dr. Golle. That the victim was involved in such an altercation with appellant the day before he was found dead was estab-

lished by evidence at trial, prior to Dr. Golle's testimony, through witnesses who described the events surrounding the victim's death. Under these circumstances, we conclude that Dr. Golle's testimony was supported by a sufficient factual basis and that the court did not abuse its discretion in admitting it.

## III.

Appellant's third contention is that the circuit court erred in admitting the testimony of Dr. John Smialek, Chief Medical Examiner for the State of Maryland, in rebuttal to the testimony of the defense's expert witness, Dr. John Adams, a forensic pathologist. Appellant maintains that Dr. Smialek's testimony concerning the cause of the victim's death was not proper rebuttal because the evidence proffered by Dr. Adams disputing the State's theory of the cause of death did not constitute "new matter."

To constitute proper rebuttal evidence, the testimony of Dr. Smialek "must have 'explain[ed], or [been] a direct reply to, or a contradiction of, any new matter that [was] brought into the case by the accused.'" *Kulbicki v. State,* 102 Md.App. 376, 383, 649 A.2d 1173 (1994), *cert. denied,* 337 Md. 706 (1995) (quoting *State v. Booze,* 334 Md. 64, 70, 637 A.2d 1214 (1994)). If his testimony did not constitute rebuttal evidence, it was error for the trial court to admit it as such. *Id.,* 102 Md.App. at 383–84, 649 A.2d 1173 (citing *State v. Hepple,* 279 Md. 265, 274, 368 A.2d 445 (1977)).

During the defense's case, Dr. Adams testified that, by calculating the rate at which the victim's body metabolized alcohol, he determined that the victim did not die until at least ten hours after the altercation with appellant. He further stated that he could conclude that the victim did not die as a result of his altercation with appellant, because any stress resulting from the altercation would have caused the fatal heart attack within one hour. Over appellant's objection, the State was permitted to present, as rebuttal evidence, Dr.

Smialek's testimony, which refuted Dr. Adams's method of calculating the time of the victim's death.

The State had not presented evidence as to the time of the victim's death during its case-in-chief. Moreover, Dr. Adams's opinion regarding the time of the victim's death was based solely on a novel method of calculating the amount of alcohol that was metabolized by the body prior to death.[4] Dr. Adams's method required him to make several assumptions that he admitted were not supported by medical literature or studies. Under these circumstances, Dr. Adams's theory regarding the time of the victim's death was "new matter" that the State properly was given an opportunity to rebut.

Our review of the record in this case also reveals that Dr. Smialek was permitted, over appellant's objections, to testify that he disagreed with Dr. Adams's conclusions that there were other possible causes of the victim's death. First, Dr. Smialek testified, over objection, that he found no evidence that esophageal varices was a factor in the victim's death. Second, he testified over objection that pneumonia was not a possible cause of the victim's death.

In the State's case-in-chief, Dr. Golle had testified that the victim, in effect, died from a heart attack that was caused by the stress that he suffered as a result of being involved in an altercation with appellant. In the defense's case, Dr. Adams opined that the cause of the victim's death was "unknown" and the manner of his death was "undetermined." [5] According to Dr. Adams, it was impossible to pinpoint exactly the cause and manner of the victim's death because the victim was suffering from so many serious maladies at the time.

---

4. Dr. Adams stated on re-direct that, without using his method of analysis, there would be no way to determine the time of the victim's death.

5. Dr. Adams testified that the phrase "[c]ause of death means the actual process, the disease process, which produced the death." The manner of death "means how did the death occur ... was it a natural phenomenon or was it caused by something unnatural such as suicide, homicide or an accident."

Dr. Smialek's testimony refuting Dr. Adam's conclusions as to the cause of the victim's death was proper rebuttal evidence. Dr. Adams's testimony injected into the case a new theory about the cause and manner of the victim's death, which constituted "new matter." Dr. Smialek's testimony to the effect that esophageal varices and pneumonia were not possible causes of the victim's death directly replied to and contradicted the new matter presented by Dr. Adams's testimony. *See Willey v. Glass,* 242 Md. 156, 164, 218 A.2d 212 (1966); *Hughes v. United States,* 633 A.2d 851, 852 (D.C.1993) (holding that court did not abuse its discretion when it allowed police officer to be re-called to testify in rebuttal that a person suggested by defense as being the real guilty party did not sell the drugs and to reiterate that defendant did).

Finally, we note that Dr. Smialek testified on rebuttal, over appellant's objection that was overruled "subject to a motion to strike," that he disagreed with Dr. Adams's testimony that the victim's coronary artery disease was "moderately severe," and that he believed the victim's coronary artery disease was severe. At the conclusion of Dr. Smialek's explanation, appellant did not move to have the testimony stricken.

■ The court was not able to determine whether Dr. Smialek's testimony, in whole or in part, constituted rebuttal evidence without hearing the testimony. Because the court was sitting as the trier of fact, it was appropriate to admit the testimony, subject to a motion to strike, in order to be able to make the evidentiary determination. We believe, therefore, that appellant was required to move to strike the testimony if he concluded that it was not proper rebuttal evidence. Because appellant failed to move that the testimony be stricken, the issue was not preserved for appellate review. *See* Md. Rule 4–323(a); *Davis v. State,* 189 Md. 269, 274, 55 A.2d 702 (1947) (citations omitted).

## IV.

■ Appellant's final contention is that his placement in the house arrest program under the supervision of the Anne

Arundel County Detention Center constitutes an illegal condition of probation. Appellant argues that being under house arrest as a condition of probation is sufficiently equivalent to being imprisoned and thus is illegal under this Court's decision in *Stone v. State*, 43 Md.App. 329, 405 A.2d 345 (1979).

In *Stone*, the trial court imposed the following condition of probation:

18 months to be served at the Anne Arundel County Detention Center on a live-in, work-out basis, concurrent with any other sentence now serving.

*Id.* at 330, 405 A.2d 345. On appeal, we questioned whether the court could impose a sentence of incarceration, suspend execution of all of it, and place the defendant on probation with a condition that he serve eighteen months in jail. Noting that a court's "broad grant of discretionary authority to place defendants on probation" under the conditions it deems proper pursuant to Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 641A is not unlimited, we concluded that, "in the absence of express statutory authority, confinement in a jail-type institution, such as the Anne Arundel County Detention Center, is not an authorized condition of probation." *Stone*, 43 Md.App. at 335, 405 A.2d 345.

We do not dispute the well settled rule in Maryland that, absent statutory authority,[6] "a court cannot impose imprisonment as a condition of probation." *Maus v. State*, 311 Md. 85, 104, 532 A.2d 1066 (1987) (citing *Stone*, 43 Md.App. at 336, 405 A.2d 345). Unlike the appellant in *Stone*, however, appellant in the case *sub judice* is not subject to "confinement in a jail-type institution." *Stone*, 43 Md.App. at 335, 405 A.2d 345. Instead, he is confined to his own residence whenever he is not working or attending school. Thus, in order to resolve this issue, we must determine whether appellant's house arrest under the supervision of the Anne Arundel County Deten-

---

**6.** Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 641(a)(1)(i)2 permits the court to impose a sentence of confinement as a condition of probation in Charles, St. Mary's, and Calvert counties under certain circumstances.

tion Center is equivalent to the imprisonment contemplated in *Stone*. Under the facts of the present case, we hold that it is not.

Although not directly on point, we find this Court's decision in *Balderston v. State*, 93 Md.App. 364, 612 A.2d 335 (1992), to be instructive. Balderston was convicted of driving while under the influence of alcohol and sentenced to the Montgomery County Detention Center for a period of sixty days, with forty-five of those days suspended in favor of a two year term of probation. As a special condition of his probation, the circuit court, pursuant to Balderston's request, ordered him to spend forty-five days in a home confinement program.[7] After Balderston had completed the forty-five day in home confinement, the court found that he had violated his probation. As a result, the court revoked his probation and reinstated his original sentence without crediting to his sentence the forty-five days spent in home confinement. On appeal, Balderston argued that "home confinement is tantamount to imprisonment, or at least custodial confinement, and that he is entitled to credit against the remainder of his sentence, pursuant to Md.Ann.Code Art. 27, § 638C,[8] for the 45 days he spent in

---

7. Pursuant to the home confinement program, Balderston was permitted to go to work and to attend an alcoholism treatment program, but was required to remain in his residence at all other times. To ensure his compliance, he was required to wear an electronic monitoring device on his ankle or wrist that would alert the Montgomery County Detention Center if he were to travel more than 700 feet away from his residence.

8. Maryland Code (1957, 1992 Repl.Vol.), Art. 27, § 638C(a) provides in relevant part:

*Credit for time spent in custody before conviction or acquittal.*—Any person who is convicted and sentenced shall receive credit against the term of a definite or life sentence or credit against the minimum and maximum terms of an indeterminate sentence for all time spent in the custody of any state, county or city jail, correctional institution, hospital, mental hospital or other agency as a result of the charge for which sentence is imposed or as a result of the conduct on which the charge is based, and the term of a definite or life sentence or the minimum and maximum terms of an indeterminate sentence shall be diminished thereby.

home confinement." *Id.* at 367, 612 A.2d 335 (footnote omitted).

This Court rejected Balderston's assertion and held that his home confinement, as a condition of probation, "cannot be considered 'custodial,' or the equivalent of custody," because he had freedom of movement and association within his home and could leave his home to attend work and alcoholism treatment meetings. *Id.* at 370, 612 A.2d 335. We further stated that, contrary to Balderston's contention, the reason he asked to participate in the home confinement program was because "it is *not* the equivalent of custody, *i.e.,* he could tend to his responsibilities and maintain his job." *Id.* We held, therefore, in accordance with cases from several other jurisdictions, that he was not entitled to sentencing credit under Art. 27, § 638C for the forty-five days that he spent in home confinement. *Id.; see also Maus v. State,* 311 Md. 85, 104, 532 A.2d 1066 (1987) (holding that stay in tightly controlled and supervised drug rehabilitation facility as a condition of probation did not constitute "custody" within the meaning of Art. 27, § 638C(a)).

*Balderston* addressed the meaning of the term "custody" as it is used in Art. 27, § 638C(a). The legislative policy underlying Art. 27, § 638C(a) is as follows:

Section 638C(a) demonstrates a legislative policy of fairness—*a desire to give a person the benefit of prison time, or similar incarceration, actually served as a result of conduct for which a sentence of incarceration is eventually imposed.* That policy is commendable in its effort to avoid inequitable stacking of punishment that could result in actual service of a period of *imprisonment* longer than the sentence imposed by the trial court.

*Maus,* 311 Md. at 107, 532 A.2d 1066 (emphasis added). We believe that the term "custody" suggests a level of confinement that is analogous to the level of confinement prohibited in *Stone v. State, supra.* In other words, an offender's sentence may only be reduced by the amount of time that he has spent in "custody" in an environment with a level of

confinement that is commensurate with "prison time or similar incarceration." We therefore conclude that, if an offender would not receive credit toward his sentence under § 638C(a) for the time spent under certain restrictive conditions of probation, then those conditions do not amount to incarceration in the "jail-type institution" referred to in *Stone.*

In the present case, the circuit court imposed upon appellant thirty months of "house arrest" in his own residence as a condition of probation. The terms of the probation require appellant to abide by "all of the Rules and Regulations of the House Arrest Alternate Sentencing Program" of the Anne Arundel County Detention Center and state that he is to be supervised by the Center, even though he was not actually enrolled in the program.[9] Under the program's regulations, appellant is required to remain in his residence whenever he is not working or attending school. Appellant will be monitored by "a portable visual telephone which allows program staff to enforce conditions of [his] house arrest sentence by oral and visual contact" and by periodic visits to his residence and place of employment.

Although restrictive, appellant's confinement to the comfort of his own home significantly differs from confinement in a "jail-type institution," such as a prison, jail, or county detention center, in several material respects. An offender who is detained at home is not subject to the conditions or regimentation of a penal institution. While at home, an offender enjoys unrestricted freedom of activity, movement, and association. He can eat, sleep, make phone calls, watch television, and entertain guests at his leisure. Furthermore, an offender

---

9. Judge Heller's written Order granting appellant house arrest as a condition of his probation was adapted from the form used by the Anne Arundel County Detention Center to enter convicts into its House Arrest Alternative Sentencing Program. Normally, the form is used to order offenders into the program as a *sentencing* measure. Judge Heller, however, crossed out certain provisions on the form and clearly indicated that appellant was being granted house arrest as a condition of his probation, and that any violation of the regulations would constitute a violation of probation.

confined to his home does not suffer the same surveillance and lack of privacy that he would if he were actually incarcerated.

We conclude that the restrictions placed on appellant's freedom pursuant to the house arrest program are comparable to, and no more onerous than, the restrictions imposed on the appellant in *Balderston.* Because we determined in *Balderston* that such restrictions did not amount to "custody" for the purpose of granting custody credit under Art. 27, § 638C(a), we conclude that the restrictions placed on appellant in the present case do not amount to "incarceration" or "confinement in a jail-type institution" as contemplated in *Stone v. State.* Accordingly, we hold that appellant's placement under "house arrest" is a lawful condition of probation.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.